Case No. 23-11119

# In the United States Court of Appeals
# for the Eleventh Circuit

---

FANE LOZMAN,

*Plaintiff-Appellant*,

*v.*

CITY OF RIVIERA BEACH, FLORIDA,

*Defendant/Appellee.*

---

OPENING BRIEF BY APPELLANT FANE LOZMAN

---

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA

---

Kerri L. Barsh
Greenberg Traurig, P.A.
333 Southeast Second Avenue
Miami, Florida 33131
Telephone: 305.579.0772
barshk@gtlaw.com

Ian Samuel
Ste. Monique Appellors LLC
1476 Springfield Way
Upland, CA 91786
Telephone: 917.803.8609
ian@stemonique.com
*Counsel for Fane Lozman*

*Fane Lozman v. City of Riviera Beach, Florida*

**Case No. 23-11119**

**CERTIFICATE OF INTERESTED PERSONS AND
<u>CORPORATE DISCLOSURE STATEMENT</u>**

Pursuant to Fed. R. App. P. 26.1 and Eleventh Circuit Rule 26.1-1, Plaintiff-Appellant submits this list, which includes the trial judge, and all attorneys, persons, associations of persons, firms, partnerships or corporations that have an interest in the outcome of this review:

1.  Barsh, Kerri L., Greenberg Traurig, P.A. – Attorney for Plaintiff

2.  Baumann, Andrew J., Lewis Longman & Walker, P.A. – Attorney for Defendant

3.  Birman, Oliver M., Perlman Bajandas Yevoli – Attorney for Plaintiff

4.  City of Riviera Beach - Defendant

5.  Lozman, Fane - Plaintiff

6.  Middlebrooks, Judge Donald M. – USDC Southern Distrit of Florida – WPB Division

7.  Morgan, Telsula C., Lewis Longman & Walker, P.A. – Attorney for Defendant

8.  Nathanson, Philip J., Trial and Appellate – Attorney for Plaintiff

9.  O'Boyle, Jonathan, The O'Boyle Law Firm – Attorney for Plaintiff

10. Petrick, Amy Taylor, Lewis Longman & Walker, P.A. – Attorney for Defendant

11. Polito, Paul J., Lewis Longman & Walker, P.A. – Attorney for Defendant

12. Ryan, James D., Ryan Law Group, PLLC – Attorney for Plaintiff

13. Samuel, Ian, Ste. Monique Apellors, LLC – Attorney for Plaintiff

14. Wynn, Dawn S., City of Riviera Beach - Defendant

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1 and Eleventh Circuit Rules 26.1-1 through 26.1-3, Appellant makes the following statement as to corporate ownership:

Appellant is an individual and does not have any parent corporation.

_____/s/ *Kerri L. Barsh*_____
Kerri L. Barsh

Respectfully submitted,

By: */s/ Kerri L. Barsh*_____
Kerri L. Barsh

Greenberg Traurig, P.A.
Wells Fargo Center, Suite 4400
333 Southeast Second Avenue
Miami, Florida 33131
Telephone: 305.579.0500
Facsimile: 305.579.0717
barshk@gtlaw.com

*Counsel for Fane Lozman*

# TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT ............................................................. C-1

CORPORATE DISCLOSURE STATEMENT ............................................. C-2

TABLE OF CONTENTS ............................................................................. i

TABLE OF AUTHORITIES ...................................................................... ii

JURISDICTIONAL STATEMENT…………………………………………… 1

STATEMENT OF THE ISSUES…………………………………………… 1

STATEMENT OF FACTS ........................................................................ 1

SUMMARY OF ARGUMENT .................................................................. 10

ARGUMENT................................................................................................ 12

   I.  THE DISTRICT COURT'S JUDGMENT ERRONEOUSLY DISREGARDS THE ECONOMIC POTENTIAL OF LOZMAN'S PARCEL WITHIN THE CONFINES OF THE UNITED STATES' NAVIGATIONAL SERVITUDE.......................................................... 12

  II.  FLORIDA'S "PUBLIC TRUST DOCTRINE" DID NOT PROHIBIT FLORIDA FROM CONVEYING LOZMAN'S LAND ..................... 16

 III.  RIVIERA BEACH'S LAND-USE PLAN DOES NOT EXCUSE THE CITY'S TAKING BUT INSTEAD COMPOSES PART OF THE TAKING ITSELF ....................................................................... 22

 IV.  LOZMAN'S LAND RETAINS NO ECONOMICALLY PRODUCTIVE USE.......................................................................... 32

CONCLUSION…………………………………………………………….. 35

CERTIFICATE OF COMPLIANCE ......................................................... 36

CERTIFICATE OF SERVICE ................................................................... 36

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Bd. of County Commissioners v. Snyder*,
  627 So. 2d 469 (Fla. 1993) .............................................................................23

*City of Riviera Beach v. Shillingburg*,
  659 So. 2d 1174 (Fla. Dist. Ct. App. 1995).................................................*passim*

*Coastal Petroleum Co. v. American Cyanamid Co.*,
  492 So. 2d 339 (Fla. 1986) ..............................................................................17

*Eide v. Sarasota County*,
  908 F.2d 716 (11th Cir. 1990) ........................................................23, 26, 27, 28

*Florida Board of Trustees of the Internal Improvement Fund v.
  Wakulla Silver Springs Co.*,
  362 So. 2d 706 (Fla. Dist. Ct. App. 1978) .........................................................18

*Lee v. Williams*,
  711 So. 2d 57 (Fla. Dist. Ct. App. 1998).........................................................18

*Lewis v. City of Union City*,
  934 F.3d 1169 (11th Cir. 2019) ........................................................................12

*Lucas v. South Carolina Coastal Council*,
  505 U.S. 1003 (1992).................................................................................*passim*

*Palazzolo v. Rhode Island*,
  533 U.S. 606 (2001)..........................................................................29, 30, 32

*Palm Beach Isles Associates v. United States*,
  208 F.3d 1374 (Fed. Cir. 2000) ..................................................................18, 19

*South Grande View Development v. City of Alabaster*,
  1 F. 4th 1299 (11th Cir. 2021) ....................................................................28, 29

*Taylor v. City of Riviera Beach*,
  801 So. 2d 259 (Fla. Dist. Ct. App. 2001).........................................4, 26, 27, 28

*United States v. Harrell*,
   926 F. 2d 1036 (11th Cir. 1991) .................................................................8, 13

*United States v. Rands*,
   389 U.S. 121 (1967).........................................................................................13

*Williamson County Regional Planning Commission v. Hamilton Bank*,
   473 U.S. 172 (1985) (overruled by *Knick v. Township of Scott*, 139
   S.Ct. 2162 (2019)) ...........................................................................................29

**Statutes**

28 U.S.C. §1291 .....................................................................................................1

28 U.S.C. §1331 .....................................................................................................1

33 U.S.C. §403 ................................................................................................8, 13

42 U.S.C. §1983 .....................................................................................................1

Fla. Stat. §163.3177(1).........................................................................................2

Fla. Stat. §163.3177(6).........................................................................................2

Fla. Stat. §253.12 ..................................................................................................1

Ordinance No. 4147 ......................................................................................*passim*

Rivers and Harbors Act.......................................................................8, 12, 13, 14

**Other Authorities**

33 C.F.R. Part 322.................................................................................................14

33 C.F.R. §320.1(a)(1).........................................................................................14

33 C.F.R. §320.1(a)(2)–(6) .................................................................................14

33 C.F.R. §320.2(b) .............................................................................................14

33 C.F.R. §320.4 ..................................................................................................15

33 C.F.R. §5329.4 ................................................................................................13

Fed. R. App. P. 27(d)(2)(A) ................................................................................36

Fed. R. App. P. 32(a)(5) ................................................................36

Fed. R. App. P. 32(a)(6) ................................................................36

Fed. R. App. P. 32(f) .....................................................................36

Fed. R. Civ. P. 56(a) ......................................................................12

https://www.usace.army.mil/missions/civil-works/Regulatory-
    Program-and-permits/ .............................................................15

## JURISDICTIONAL STATEMENT

The district court had jurisdiction under 28 U.S.C. §1331, because this civil action arises under 42 U.S.C. §1983. Dkt. 1 ¶2. This Court has jurisdiction under 28 U.S.C. §1291, because this is an appeal from a final decision of a district court of the United States. Dkt. 198. The district court entered judgment on April 4, 2023, Dkt. 198, and this appeal was timely noted on April 7, 2023, Dkt. 200.

## STATEMENT OF THE ISSUES

Whether the City of Riviera Beach has taken Fane Lozman's property without just compensation.

## STATEMENT OF FACTS

**1.** More than a century ago, the "title to all islands, sandbars, shallow banks or small islands" in the tidal waters of Florida was vested "in the trustees of the Internal Improvement Fund of the State of Florida." Acts 1917, Ch. 7304, Sec. 1 (codified at Fla. Stat. §253.12). The property at issue in this case, which is encompassed by that description, is within approximately 311 acres of land in the Lake Worth Lagoon, which was conveyed by the state via TIITF Deed 17,146 in 1924. Dkt. 144, Exh. 1 ¶4. That deed expressly included the right to develop the land for residential use, including the right to bulkhead and fill the land. *See* Fla. Stat. §253.12. The property was zoned for residential use, and in the ensuing decades, about 160 acres were bulkheaded and filled, and hundreds of homes were built.

1

Under Florida's Growth Management Act, every municipality in the state must develop a plan containing "principles, guidelines, standards, and strategies for the orderly and balanced future economic, social, physical, environmental, and fiscal development of the area." Fla. Stat. §163.3177(1). Among other things, the plan must contain a "future land use" map, "designating proposed future general distribution, location, and extent of the uses of land for residential uses, commercial uses, industry, agriculture, recreation, conservation, education, public facilities, and other categories of the public and private uses of land." Fla. Stat. §163.3177(6). In 1991, Riviera Beach adopted such a plan, which (as relevant here) designated the still-submerged portions of TIITF Deed 17,146—including the land at issue in this case—as a "special preservation" district. Riviera Beach Comprehensive Plan 16. The plan's "policy objective" was to "preclude and [sic] development of Submerged Lands," as part of a plan to promote "Public-related Land uses." *Id.* The city also announced its intent to "oppose any application for dredge or fill pending permits before applicable State or Federal agencies for lands in the Preservation Area." *Id.*

The city's plan freezing all development in the submerged lands conveyed by Deed 17,146 caused two people to sue the city, alleging that the comprehensive plan had taken their property without just compensation. *City of Riviera Beach v. Shillingburg*, 659 So. 2d 1174 (Fla. Dist. Ct. App. 1995). Both plaintiffs argued that, because "they could do nothing more than put viewing docks on their submerged

lands," the "enactment of the plan constituted a taking." *Id.* at 1178–79. The trial court agreed, but the Florida court of appeals reversed. The *Shillingburg* court held first that "the comprehensive land use plan did not *per se* deprive landowners of their property without just compensation," because the plan stated that Riviera Beach planned to "conduct research and determine those uses that would be compatible with the city's preservation policies," thus contemplating "viable uses for the property consistent with Riviera Beach's policy objectives." *Id.* at 1179. "The fact that the plan was amended to allow for a dock," as requested by one of the plaintiffs, "demonstrates the built-in flexibility of the plan." *Id.* Given that the plan left "open the possibility of reasonable use," the court of appeals concluded that "any facial challenge based on just compensation principles must fail as a matter of law." *Id.*

The *Shillingburg* court also concluded that whether the comprehensive plan was a taking "as applied" to the particular properties at issue was not yet ripe, because there had not "been a final decision from the appropriate governmental entity as to the nature and extent of the development that will be permitted." *Id.* at 1180. Riviera Beach had not, the *Shillingburg* court held, arrived at "a final, definitive position regarding how it will apply the plan" to the individual properties within the special preservation district, or whether it might approve certain uses "based on the specifics of what each landowner submits." *Id.*

3

Six years later, one of the landowners in *Shillingburg* returned to the Florida Court of Appeals, arguing that the city's comprehensive plan had now been applied to her property, and thus that her claim for a regulatory taking was now ripe. *Taylor v. City of Riviera Beach*, 801 So. 2d 259 (Fla. Dist. Ct. App. 2001). Taylor had asked Riviera Beach for a "permit to build a single family residence" within the comprehensive plan's special-preservation district, and the city had denied the permit. *Id.* at 261–62. The court of appeals concluded that the city had now resolved "how Riviera Beach would apply the Plan to her property," thus "rendering the case ripe for judicial review." *Id.* at 263.

Thus, as of 2001, the basic expectation of landowners (reflecting the holdings of the Florida courts) was that the Riviera Beach comprehensive plan could not be challenged as a "taking" by the owners of land within TIITF Deed 17,146 until the city made, as to *each landowner*, a "final, definitive" decision "regarding how it will apply the plan," *Shillingburg*, 649 So. 2d at 1180, which would then render a takings claim "ripe for judicial review," *Taylor*, 801 So. 2d 263. The "possibility of reasonable use" remained under the comprehensive plan, due to its "built-in flexibility," such as the possibility of the plan being "amended" to "allow" for uses that landowners desired. *Shillingburg*, 649 So. 2d at 1179.

2.    The appellant, Fane Lozman, acquired the parcel of land at issue in this case in 2014. Dkt. 138, Exh. #1 (Lozman Affidavit), at ¶16. Its previous owner was

a woman named Omah Kiser, who told Lozman that she "admired" his well-publicized legal battles with the city. Lozman Affidavit ¶15. The property had belonged to Kiser's father, who had operated a small restaurant on it; but the restaurant had been destroyed in a storm and never rebuilt, and Kiser was elderly and had no intention of developing the property herself at that late stage of her life. Lozman Affidavit ¶¶14–15. Kiser wanted to give Lozman the property for free, but Lozman insisted on paying her for it, and purchased the parcel for $24,000. Lozman Affidavit ¶16.

After Lozman purchased the property, he secured a street address (5101 North Ocean Drive) and moved a floating home onto it. Lozman Affidavit ¶¶20, 27. From 2016 to 2021, Lozman enjoyed a homestead tax exemption for the property and used it for that purpose. Vandals sunk Lozman's first floating home, Lozman Affidavit ¶27, and Lozman replaced it with a floating container home in 2019, Lozman Affidavit ¶¶29–30. The floating container home has two sliding impact doors, impact windows, a tiled bathroom with shower and toilet, a kitchen, a rooftop deck, and electricity. Lozman Affidavit ¶29. But Lozman's attempt to secure a permit to build a fence on his property was denied, as was his request for water and permanent electrical service. Lozman Affidavit ¶¶34-35, 40.

In 2020, six years after Lozman acquired his property, the city adopted Ordinance No. 4147. The ordinance created a new zoning district, "SP Special

Preservation District," the purpose of which was to "conserve" "natural resources" that the ordinance describes as "the City's." Sec. 31-521. The only "uses" that are "permitted" in the district are small "fishing or viewing platforms and docks for non-motorized boats"; "mitigation land banks"; and "preservation land." There is no possibility of exception to these rules and any use "not specifically stated as a use permitted within this section" is "prohibited." Sec. 31-522. Lozman's land was included within the new "special preservation district."

Lozman then filed the complaint that forms the basis for this action. Dkt. 1 ("Complaint"). Lozman's complaint explained that the deed to his land conveyed the right to bulkhead and fill the property, Compl. ¶8-9, and that approximately 160 of the 311 acres conveyed by the relevant TIITF had in fact been filled, Compl. ¶11. The complaint further explained that all of the land conveyed by the TIITF deed remained zoned for residential use, Compl. ¶12, and that much of the land was being used in precisely that way, Compl. ¶13. The complaint alleged that although Lozman's intent was to use the parcel for a residence, the city's various actions—culminating in the passage of Ordinance 4147—had rendered that impossible. Compl. ¶¶17–27. Following the passage of the ordinance, the complaint detailed, Lozman's homestead exemption was revoked. Compl. ¶28.

**3.**    Following discovery, Lozman and the city each moved for summary judgment, and the district court entered summary judgment for the city. Dkt. 197 ("Order").

The district court began by acknowledging that "when the owner of real property has been called upon to sacrifice all economically beneficial uses in the name of the common good, that is, to leave his property economically idle, he has suffered a taking." Order 10 (quoting *Lucas v. South Carolina Coastal Council*, 505 U.S. 1003, 1019 (1992)). But, the district court said, " 'the Takings Clause does not require compensation when an owner is barred from putting land to a use' proscribed by existing rules or understandings." Order 10 (quoting *Lucas*, 505 U.S., at 1030). In other words, the district court reasoned that the general rule of *Lucas* is subject to a " 'logically antecedent inquiry' into the background principles of property law as that determines the nature of the private property allegedly taken." Order 10. If "the nature of the owner's estate shows that the prescribed use interest were not part of his title to begin with," then the state need not pay compensation. Order 10 n.2 (quoting *Lucas*, 505 U.S., at 1027).

The district court then concluded that there were three such "background principles of both federal and state law" that "have always … limited" Lozman's property interests. Order 12.

7

First, the district court concluded that most of Lozman's property was submerged beneath the "navigable waters of the United States" under the Rivers and Harbors Act, and that Lozman thus never had any right to develop it. Order 12. That is because the Act provides that it shall not be lawful to "build," "excavate," or "fill" in any "water of the United States," except as authorized by the Army Corps of Engineers. 33 U.S.C. §403 (requiring that such activities be "recommended by the Chief of Engineers and authorized by the Secretary of the Army"). Lozman's property, the district court thought, was under the "waters of the United States" because it was "subject to the ebb and flow of the tide." Order 13 (quoting 33 C.F.R. 5329.4; *United States v. Harrell*, 926 F. 2d 1036, 1039 (11th Cir. 1991). The district court also observed that the Florida Department of Environmental Protection had "instituted enforcement proceedings" against Lozman on the grounds that he had attempted to place "structures" in a manner that "threatened navigation," and that Lozman had subsequently agreed not to place anything within the property "unless a valid permit is issued by the Department." Order 13–14.

Second, the district court also concluded that Florida's "public trust doctrine" had prohibited Florida from conveying Lozman's submerged lands to him in the first place. Order 14–18. Under this "doctrine," the district court held, the "ability" of the state to "alienate" submerged lands "is limited," and cannot be done for the purpose of "reduction into several or individual ownership." Order 14 (quoting *State v. Black*

8

*River Phosphate Co.*, 13 So. 640, 648 (1893)). Rather, all lands beneath navigable waters are "for the use and enjoyment of the same by all of the people." Order 14 (quoting *Black River Phosphate Co.*, 13 So., at 648). Lozman's land, the district court reasoned, was originally conveyed to "the Lake Worth Realty Company by the Board of Trustees of the Internal Improvement Trust Fund of the State of Florida in 1924" — but the "authority given to the Trustees . . . is narrowly circumscribed by the public trust doctrine and *could not divest the public of ownership of navigable waters*." Order 15 (emphasis added) (citing *Coastal Petroleum Co. v. American Cyanamid Co.*, 492 So. 2d 339, 342 (Fla. 1986) and *Deering v. Martin*, 116 So. 54 (Fla. 1928)). After a further canvas of "the history and evolution of Florida law pertaining to submerged lands," the district court thought it "apparent" that Lozman "never had any right or reasonable expectation to develop those portions of his land." Order 18.

Third, the district court concluded that the city's comprehensive land-use plan had "precluded use of submerged lands" since 1991 (when it was adopted). Order 19–20. Under Florida law, the district court reasoned, such land-use plans are "paramount and non-discretionary" once adopted, such that an "inconsistent zoning ordinance cannot be relied upon." Order 18. Because Lozman's property has been designated for "special preservation" by the land-use plan since its adoption, and such a designation precludes "any development" of the submerged lands, the district

9

court held that Lozman had no "reasonable expectation or right" to develop the submerged portions of his land. Order 6, 20.

Finally, the district court also concluded (Order 20–21) that Lozman had not been "denied all economically productive or beneficial uses" of his land. Quoting *Tahoe-Sierra Prs. Council v. Tahoe Reg'l Planning Agency*, 535 U.S. 302 (2002), the district court reasoned that only government action that "wholly eliminated the value" of a landowner's property qualified as a taking. But the district court concluded that Lozman "continues to have what he has always had," which is "a narrow strip of dry land" that was "likely worth more than he paid." Order 21. Thus, the district court concluded, the "value of his property has not been wholly eliminated." Order 21.

## SUMMARY OF ARGUMENT

Riviera Beach has undoubtedly taken Fane Lozman's property, and the district court erred in concluding otherwise. The judgment of the district court should be vacated and this case remanded for a trial on the measure of damages.

Although the United States' navigational servitude places certain restrictions on Lozman's parcel, that servitude does not make economically productive use of the land impossible. For one thing, not all of Lozman's parcel is subject to that servitude—most obviously, the part of the parcel that is dry land. But more importantly, private property within the navigable waters of the United States can

be put to economically productive uses if the landowner secures the permission of the Army Corps of Engineers. The city's ordinance would prohibit even Army Corps-permitted uses, however, effecting a deprivation above and beyond the background restrictions inherent to the navigational servitude of the United States.

Nor did Florida's "public trust" doctrine prohibit the state from validly conveying title to the marine portion of Lozman's parcel in the first place. Under Florida law, the public trust doctrine applies only to bodies of water that were navigable in 1845 (when Florida entered the union) — but does not apply to waterways rendered navigable through improvement by dredging or other artificial means. The marine portion of Lozman's parcel was not navigable in 1845; it was only rendered "marine" at all by an illegal dredge channel that was created much later, so the public trust doctrine does not apply to it.

Nor does Riviera Beach's comprehensive land-use plan excuse the city's taking, as the district court thought. Rather, that land-use plan (as later reduced to a zoning ordinance and enforcement actions taken against Lozman) is one of the actions *comprising* the taking. As the city successfully argued in Florida state court more than 20 years ago, and as this Court has subsequently held, a takings challenge to a land-use plan is not ripe until the plan is either enforced against the landowner or reduced to something more concrete, like a zoning restriction. Because those actions did not occur until after Lozman acquired his parcel, this litigation represents

the first opportunity that he (and his predecessors-in-interest) have had to challenge the land-use restrictions at all.

The city's actions have taken Lozman's property. The only question that remains to be determined is the value of what was taken. For that reason, the judgment of the district court should be vacated, and the case remanded with instructions to enter summary judgment for Lozman on the question of liability and conduct a trial on damages.

## ARGUMENT

This Court reviews *de novo* the district court's grant of summary judgment, "viewing all evidence and drawing all reasonable factual inferences in favor of the nonmoving party." *Lewis v. City of Union City*, 934 F.3d 1169, 1179 (11th Cir. 2019). Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

## I.    THE DISTRICT COURT'S JUDGMENT ERRONEOUSLY DISREGARDS THE ECONOMIC POTENTIAL OF LOZMAN'S PARCEL WITHIN THE CONFINES OF THE UNITED STATES' NAVIGATIONAL SERVITUDE.

The district court first concluded that most of Lozman's property was submerged beneath the "navigable waters of the United States" under the Rivers and Harbors Act, and that Lozman thus never had any right to develop it. Order 12. For two independent reasons, the navigational servitude of the United States does not,

as a background rule, deprive Lozman of all economically productive uses of his land; therefore, it is not a bar to recovery under *Lucas*.

First, the navigational servitude of the United States does not *apply* to Lozman's entire parcel. The Rivers and Harbors Act provides, as relevant here, that it shall not be lawful to "build," "excavate," or "fill" in any "water of the United States," except as authorized by the Army Corps of Engineers. 33 U.S.C. §403 (requiring that such activities be "recommended by the Chief of Engineers and authorized by the Secretary of the Army"). Lozman's property, the district court thought, was under the "waters of the United States" because it was "subject to the ebb and flow of the tide." Order 13 (quoting 33 C.F.R. 5329.4; *United States v. Harrell*, 926 F. 2d 1036, 1039 (11th Cir. 1991). And indeed, by regulation, the "navigable waters of the United States" are "those waters that are subject to the ebb and flow of the tide and/or are presently used, or have been used in the past, or may be susceptible for use to transport interstate or foreign commerce." 33 C.F.R. §5329.4.

But "[t]he navigational servitude of the United States does not extend beyond the high-water mark." *United States v. Rands*, 389 U.S. 121, 123 (1967). Therefore, "federal regulatory jurisdiction over rivers and lakes, *i.e.,* the navigational servitude of the United States," does not extend beyond "the edge … of all such waterbodies." *United States v. Harrell*, 926 F.2d 1036, 1040–41 (11th Cir. 1991) (quoting then-

13

current version of 33 C.F.R. §329.11(a)). And as the district court acknowledged, there is a stretch of Lozman's property "along N. Ocean Drive," that is "dry land," amounting to roughly a quarter-acre. Order 2. Because that dry land is beyond the "edge" of the water body it is next to, "federal regulatory jurisdiction" does not extend to it, the "navigational servitude of the United States" does not encumber it, and Riviera Beach is thus squarely responsible for depriving Lozman of right to develop it.

Second, even private property within the navigable waters of the United States can be put to economically productive uses if the landowner secures the permission of the Army Corps of Engineers. *See* 33 C.F.R. Part 322 ("Permits for Structures or Work in or Affecting Navigable Waters of the United States"). Although the "primary thrust of the Corps' regulatory program" was once limited to "the protection of navigation," since 1968, "the program has evolved to one involving the consideration of the full public interest by balancing the favorable impacts against the detrimental impacts." 33 C.F.R. §320.1(a)(1). The Corps' permitting practices "reflects the national concerns for both the protection *and utilization of* important resources." *Id.* (emphasis added). The Corps is "a highly decentralized organization," and as a general matter, it is the Corps' thirty-six "district engineers" that decide permit applications, including those for activities covered by the Rivers and Harbors Act. 33 C.F.R. §320.1(a)(2)–(6). *See also* 33 C.F.R. §320.2(b) (noting the Corps'

authority to permit work pursuant to "Section 10 of the Rivers and Harbors Act approved March 3, 1899").

As the Army Corps of Engineers explains, such permits are issued with an eye toward balancing "the reasonably foreseeable benefits and detriments of proposed projects," as well as recognizing "the essential values of the Nation's aquatic ecosystems to the general public, as well as the property rights of private citizens who want to use their land." U.S. Army Corps of Engineers, *Obtain a Permit*, https://www.usace.army.mil/missions/civil-works/Regulatory-Program-and-permits/ Obtain-a-Permit/ (last accessed Aug. 22, 2023). During the permit process, "the Corps considers the views of other Federal, state and local agencies, interest groups, and the general public," and the "results of this careful public interest review are fair and equitable decisions that allow reasonable use of private property, infrastructure development, and growth of the economy," while offsetting "adverse impacts to the aquatic environment," often by "mitigation requirements" (such as "restoring, enhancing, creating and preserving aquatic functions and values"). *Id. See also* 33 C.F.R. §320.4.

But even if Lozman could secure an Army Corps permit for development in the marine area of his property, Riviera Beach's zoning would not allow for it. "Any use not specifically stated as a use permitted" by Ordinance 4147 is "prohibited," and the only uses "permitted" under that ordinance are a "residential fishing or

viewing platforms and docks for non-motorized boats," mitigation land banks, and preservation. Sec. 31-522(a)–(c). There is no exception under Riviera Beach's ordinance for an Army Corps-permitted use; the ordinance therefore deprives Lozman of the possibility of using his property in the economically productive way contemplated by the Army Corps' regulations.

In sum, Riviera Beach's restrictions on Lozman's property are more restrictive than the navigational servitude of the United States in two respects: first, the city's zoning applies even to the dry land Lozman owns (which the navigational servitude does not), and second, the city's zoning prohibits even uses permitted by the Army Corps of Engineers (which the navigational servitude does not). The district court was therefore wrong to conclude that the national navigational servitude rendered his land economically unproductive prior to his acquiring it.

## II. FLORIDA'S "PUBLIC TRUST DOCTRINE" DID NOT PROHIBIT FLORIDA FROM CONVEYING LOZMAN'S LAND.

The district court also erred when it concluded that Florida's "public trust doctrine" had prohibited Florida from conveying Lozman's submerged lands to him in the first place. Order 14–18. According to the district court, this state-law doctrine "limits" the "ability" of the state to convey submerged lands, and in particular, prohibits such a conveyance for the purpose of "reduction into several or individual ownership." Order 14 (quoting *State v. Black River Phosphate Co.*, 13 So. 640, 648 (1893)). Under this doctrine, all lands beneath navigable waters are "for the use and

enjoyment of the same by all of the people." Order 14 (quoting *Black River Phosphate Co.*, 13 So. at 648). Thus, according to the district court, the authority of the Board of Trustees of the Internal Improvement Fund of the State of Florida—which conveyed the land to Lozman's remote predecessor-in-interest—was "narrowly circumscribed by the public trust doctrine and could not divest the public of ownership of navigable waters." Order 15 (citing *Coastal Petroleum Co. v. American Cyanamid Co.*, 492 So. 2d 339, 342 (Fla. 1986) and *Deering v. Martin*, 116 So. 54 (Fla. 1928)).

"Florida received title to all lands beneath navigable waters, up to the ordinary high water mark, as an incident of sovereignty, when it became a state in 1845." *Coastal Petroleum v. American Cyanamid*, 492 So. 2d 339, 342 (Fla. 1986). That much is true. Such the title to such "sovereignty lands" is "vested in the state to be held as a public trust." *Id.* By contrast, however, "the title to *non-navigable swamp and overflowed lands*, and other federal uplands," was conveyed to Florida by Congress in the 1850s; the title to such lands (those *not* beneath navigable waters) "was vested in the Board of Trustees for the Internal Improvement Fund of Florida by the legislature." *Id.*

The "public trust doctrine" thus applies, as *Coastal Petroleum* makes clear, only to lands beneath navigable waters, and only to those navigable in 1845. The doctrine does *not* apply to waterways later rendered navigable through improvement

17

by dredging or other artificial means. The Florida Supreme Court has "adhered to the principle that state sovereignty ownership extends only to lands under tidal *navigable* waters." *Lee v. Williams*, 711 So. 2d 57, 62 (Fla. Dist. Ct. App. 1998) (quoting *Hayes v. Bowman*, 91 So.2d 795, 799 (Fla. 1957)). Florida waters are "not considered navigable merely because they are affected by the rise and fall of the tides." *Florida Board of Trustees of the Internal Improvement Fund v. Wakulla Silver Springs Co.*, 362 So. 2d 706 (Fla. Dist. Ct. App. 1978). And the "subsequent dredging of a navigable channel across a nonnavigable body of water does not render that body of water navigable" for purposes of the public-trust doctrine. *Id.* at 711 (citing *Clement v. Watson*, 63 Fla. 109 (1912)). That makes sense: what matters is the facts as they existed in 1845, after all.

And therein lies the problem: The marine portion of Lozman's parcel was not "navigable," in the sense required, in 1845; and it is not navigable in that sense now. For one thing, the Lake Worth lagoon, in which Lozman's marine property is located, was originally "a land-locked freshwater lake." *Palm Beach Isles Associates v. United States*, 208 F.3d 1374, 1377 (Fed. Cir. 2000). But long after 1845, "a cut, Lake Worth Inlet, was made across the spit that separates the lake from the ocean, and as a result the lake is now a tidal water with direct access to the ocean." *Id.* And a "channel has been dredged along the western shore of the lake to provide a readily-navigable passage for vessels," thus rendering Lake Worth a "navigable water *of the*

*United States*," *id.* (emphasis added), but that is not the same as being navigable *in 1845*.

The district court did not cite any record evidence for the proposition that the marine area of Lozman's land is subject to Florida's public-trust doctrine; none exists. To the contrary, in 1924, when Lozman's property was sold, it was "dry or overflowed lands as depicted on the plat, dated January 5, 1924, that was part of the TIITF deed paperwork." Dkt. 144 Exh. 1, ¶4. A map from 1879, introduced in discovery, illustrates the non-navigability of the lake:



Dkt. 144 Exh. 3. (Annotation in document as produced.) As this map highlights, in 1879, Lozman's property, "at its current latitude of 26 degrees 48 minutes and longitude of 80 degrees 2 minutes," was on "dry land on the east side of Lake Worth." Dkt. 144 Exh. 1 ¶4. It was not until the "late 1930s" when a trench was (illegally) dredged near Lozman's property ("to construct North Ocean Drive") that

Lozman's dry land began eroding into the trench. Dkt. 144 Exh. 1 ¶8. This 1953 aerial photograph, from the City of Riviera Beach's boundary and tidal water survey, illustrates the illegally dug borrow trench:



Dkt. 134 Exh. 20 ("Boundary and Tidal Water Survey for: City of Riviera Beach") at 5.

A contemporary photograph of the property illustrates both the dredge channel and the utterly non-navigable mud flats that surround it:



Dkt. 144 Exh. 7. (Annotations in document as produced.) It is "impossible to use this mudflat for national or international commerce," because "even a canoe or kayak transiting through this area would run aground during low to slack tide in the ankle-deep water." Dkt. 144 Exh. 1 ¶8.

Indeed, as the *district court acknowledged* — seemingly without realizing the significance of this fact — the deed to the land in which Lozman's parcel is located is issued pursuant to a Florida law that permitted the sale of land "made by the process of dredging of the channel by the United States Government located in the tidal waters of the counties in the State of Florida," or "similar" lands "upon which the water is not more than three feet deep at high tide and which are separated from the shore by a channel or channels, not less than five feet deep at high tide." Order

21

15 (quoting *Deering v. Martin*, 95 Fla. 224, 229, 116 So. 54 (1928)). Right: and *those were not navigable waters in 1845*.

The parties did not brief the public-trust doctrine's applicability to Lozman's land—the court below raised the issue for the first time in its summary judgment opinion and seems to have simply assumed that Lozman's property qualified as "sovereignty lands." But as illustrated above, it does not.

## III. RIVIERA BEACH'S LAND-USE PLAN DOES NOT EXCUSE THE CITY'S TAKING BUT INSTEAD COMPOSES PART OF THE TAKING ITSELF.

Finally, the district court misunderstood matters when it concluded that the city's comprehensive land-use plan had "precluded use of submerged lands" since 1991 (when it was adopted). Order 19–20. Under Florida law, the district court reasoned, such land-use plans are "paramount and non-discretionary" once adopted, such that an "inconsistent zoning ordinance cannot be relied upon." Order 18. Because Lozman's property has been designated for "special preservation" by the land-use plan since its adoption, and such a designation precludes "any development" of the submerged lands, the district court held that Lozman never had any "reasonable expectation or right" to develop the submerged portions of his land. Order 6, 20.

That is wrong. Riviera Beach's comprehensive land-use plan is not a justification or exception to the taking; rather, it constitutes one of the actions

*constituting the taking at issue*. To understand why, it is necessary to consider the history of litigation over the land-use planning of the city in some detail.

"Florida's land use planning statutes provide for the adoption of comprehensive plans to control and direct the use and development of property within a county or municipality." *Eide v. Sarasota County*, 908 F.2d 716, 718 (11th Cir. 1990). Specifically, "each county and municipality is required to prepare a comprehensive plan for approval by the Department of Community Affairs." *Bd. of County Commissioners v. Snyder*, 627 So. 2d 469, 473 (Fla. 1993). The adopted local plan must include " 'principles, guidelines and standards for the orderly and balanced future economic, social, physical, environmental, and fiscal development' of the local government's jurisdictional area." *Id.* (citing Flat Stat. §163.3177(1) (1991)). "Once a comprehensive plan for an area is adopted, all development approved by a governmental agency must be consistent with the plan." *Eide*, 908 F.2d at 719.

Riviera Beach first adopted such a plan in 1989. *City of Riviera Beach v. Shillingburg*, 659 So. 2d 1174, 1177 (Fla. Dist. Ct. App. 1995). At the time that Riviera Beach adopted the plan, the portions of TIITF Deed 17,146 within Riviera Beach's boundaries were generally designated RS-5, which is "a single-family residential zoning designation." *Id.* at 1177. The *submerged* portions of that land were designated required "permit approval from various state agencies" before it could be developed, however, as had been the case for decades. *Id.* Riviera Beach's

1989 plan contemplated "residential uses" in line with the existing zoning, but the state's Department of Community Affairs required Riviera Beach to revise the plan "to establish a lower density for areas designated as preservation or utilize other land use strategies or mechanisms that will insure the protection of the referenced environmentally sensitive lands." *Id.* (quoting "Statement of Intent and Notice of Intent" by the department).

In response to the department's objection, Riviera Beach revised its land-use plan in 1991. The revised plan provided, as to the areas relevant here, that it was "the expressed policy objective of the City to preclude any development of submerged lands," and that the city would "oppose any applications for dredge or fill permits pending before applicable State or Federal agencies," but included a proviso that the plan would not be "construed, nor implemented to impair or preclude judicially determined vested rights to develop or alter submerged lands." *Id.* The plan also provided that the city would conduct "research" to "determine uses that would be compatible with the city's preservation policies." *Id.* As amended, the state Department of Community Affairs approved the plan. *Id.*

Two landowners, John Shillingburg and Joan Taylor, then brought suit against Riviera Beach, claiming that the land-use plan constituted a regulatory taking. Shillingburg alleged that "he made an application to construct a viewing dock on his submerged land and Riviera Beach had denied his request for a permit," and Taylor

alleged that "she was prohibited from building a dock, a viewing platform or a single family residence," and had been informed that "no docks would be allowed and that no construction of any type would be allowed." *Id.* at 1177–78. In response to the suit, Riviera Beach amended its land-use plan to allow "private residential fishing or viewing platforms and docks for nonmotorized boats." *Id.* at 1178. Nevertheless, the Florida trial court concluded that "by virtue of the enactment of the plan, the economic viability of landowners' properties had been destroyed." *Id.* at 1179. Although Riviera Beach had argued the suits were premature, the trial court disagreed, concluding that the plaintiffs had "the right to rely on the plain language of the Defendant's Comprehensive Land Use Plan." *Id.*

On appeal, the Florida court of appeals reversed. *Id.* at 1183. The court of appeals first concluded that the landowners "could not successfully maintain a facial challenge to the plan." *Id.* at 1179. That was so, the court said, because although the city's stated objective was "to preclude development of submerged lands," the plan contemplated further "research" into "uses that would be compatible with the city's preservation policies." *Id.* Thus, the court said, "the language of the plan itself contemplates viable uses for the property consistent with Riviera Beach's policy objectives." *Id.* On top of that, the fact that the plan could be *amended* (as it already had been) demonstrated that it had "built-in flexibility." *Id.* Because the plan, on its face, left open the possibility of "reasonable use," and provided "a mechanism

25

whereby landowners could seek additional uses of their properties," the *Shillingburg* court concluded that "any facial challenge based on just compensation principles must fail as a matter of law." *Id.* at 1179–80.

The court of appeals then considered whether the city's land-use plan constituted a regulatory taking *as applied to the landowners' properties*. And as to that, the court of appeals concluded that the question was not yet ripe. *Id.* at 1180–82. That was so, said the court of appeals, because the plan standing alone did not constitute "a final decision from the appropriate governmental entity as to the nature and extent of the development that will be permitted." *Id.* at 1180. The city had not, the court said, "been given a meaningful opportunity to arrive at a final, definitive position regarding how it will apply the plan" to each of the landowners' properties, or whether it would "approve an amendment based on the specifics of what each landowner submits." *Id.* Citing this Court's decision in *Eide v. Sarasota County*, 908 F.2d 716 (11th Cir. 1990), the Florida court of appeals noted that "generally a land use agency can make a final decision only when it has an application before it." *Shillingburg*, 659 So. 2d at 1180.

Following the court of appeals' decision in *Shillingburg*, Joan Taylor, one of the landowners in the suit, "applied for a permit to build a single family residence." *Taylor v. City of Riviera Beach*, 801 So. 2d 259, 261 (Fla. Dist. Ct. App. 2001). Riviera Beach denied the application, citing "the 'Future Land Use Map' in the City

of Riviera Beach Comprehensive Plan," which "designates the area of submerged lands in which this property is located as 'Special Preservation,'" and noting that "the City's comprehensive plan does not allow the construction of single or multi-family residential development in areas with a Special Preservation land-use designation." *Id.* at 261.

Taylor then filed suit against the city, alleging a regulatory taking of her property. *Id.* Riviera Beach argued that Taylor's complaint was not yet ripe for judicial review, "because Taylor had failed to make a meaningful application for *amendment*" to the city's land-use plan. *Id.* at 262 (emphasis added). The trial court agreed, and dismissed Taylor's complaint, but the court of appeals reversed. *Id.* at 264. In the court of appeals' view, "Riviera Beach's denial of her building permit application constituted final agency action with regards to how Riviera Beach would apply the Plan to her property, rendering the case ripe for judicial review." *Id.* at 263. *Shillingburg*, the *Taylor* court said, did not "mandate[] that Taylor submit an application for amendment to the Plan," as the city contended; rather, what *Shillingburg* required (and what *Taylor* thought had occurred) was a "meaningful application for intended use of the land." *Id.* The court of appeals thus remanded for "further proceedings" on the merits of the regulatory taking claim. *Id.* at 264.

*Shillingburg* and *Taylor* both cited this Court's decision in *Eide*, which considered an as-applied challenge to a Florida land-use plan. 908 F.2d at 718–20.

27

*Eide* recognized that, as a matter of Florida law, once "a comprehensive plan for an area is adopted, all development approved by a governmental agency must be consistent with the plan." *Id.* at 719. Nevertheless, this Court held in *Eide*—consistent with ordinary rules of Article III ripeness—that to challenge a land-use plan, the landowner "must first demonstrate" that the plan "has been *applied* to his property." *Id.* at 725 (emphasis in original). As this Court has recently recognized, the rule of *Eide* remains good law: "In order for a just compensation claim to be ripe for adjudication ... the landowner must obtain a final decision regarding the application of the zoning ordinance or regulation to his or her property." *South Grande View Development v. City of Alabaster*, 1 F. 4th 1299 (11th Cir. 2021) (quoting *Eide*, 908 F.2d at 720–21).

The most important thing that the *Shillingburg* and *Taylor* cases illustrate is that a comprehensive plan, by itself, is not a compensable "taking" until it is reduced to something more concrete—like specific decisions directed at the landowner (amply present here) or a specific zoning ordinance (here, Ordinance 4147). That is also the rule announced by this Court in *Eide* and *South Grande View*. *Eide* holds—just as the city urged the Florida courts in *Shillingburg* and *Taylor* to hold—that "a general plan for a large portion of the county" does not "take" anything by itself. *South Grande View*, 1 F. 4th at 1306–07 (discussing *Eide*). By contrast, in *South Grande View*, this Court held that once a general land-use plan is reduced to

a specific rezoning, as it was here, the "zoning ordinance" itself constitutes a "final decision on the merits," and permits a takings claim to proceed. *Id.* at 1306.

And at the time Lozman acquired his property, the Florida courts' position on this matter *necessarily* bound him, under the then-operative rule of *Williamson County Regional Planning Commission v. Hamilton Bank*, 473 U.S. 172 (1985) (overruled by *Knick v. Township of Scott*, 139 S.Ct. 2162 (2019)). In *Williamson County*, the Court held that "a property owner has not suffered a violation of the Just Compensation Clause until the owner has unsuccessfully attempted to obtain just compensation through the procedures provided by the State," *including*, crucially, resort to the state courts. *Id.* at 195. *Knick* did not overrule this aspect of *Williamson County* until five years after Lozman acquired his property; until that time, Lozman would have had to assert a takings claim in state court, where he would have been bound by *Shillingburg*, which held that the plan was not a taking on its face, and that he could not challenge it until the city had made it clear how the plan would be applied to him.

The fact that Lozman acquired his property after the comprehensive plan's adoption, but prior to the city making clear how it would apply the plan to him such that his takings claim was ripe, places him in the same situation as the landowners in *Palazzolo v. Rhode Island*, 533 U.S. 606 (2001). In *Palazzolo*, the "wetlands regulations" that were objected to were already "in force" at the time "title was

29

transferred to petitioner," and the state courts held that "the postregulation acquisition of title was fatal to the claim for deprivation of all economic use." *Id.* at 626. *Exactly as the district court did here*, the state court's holding in *Palazzolo* was "couched in terms of background principles of state property law" under *Lucas*. *Id.* The "theory underlying the argument that postenactment purchasers cannot challenge a regulation under the Takings Clause seems to run on these lines," the Court said: "Property rights are created by the State," and thus "by prospective legislation the State can shape and define property rights and reasonable investment-backed expectations, and subsequent owners cannot claim any injury from lost value." *Id.* "After all," the Court said (summarizing the argument it was about to reject), "they purchased or took title with notice of the limitation." *Id.* That is *exactly* the argument accepted by the district court here. *Compare*, *e.g.*, Order 10 ("Interests in property are not created by the Constitution," the court said, but by "state law"); Order 19–20 ("[F]rom December 19, 1991 forward, Mr. Lozman's property was designated by a Comprehensive Plan as a Special Preservation Area," so he had no "reasonable expectation or right" to use his land).

But the Supreme Court reversed. "The State may not put so potent a Hobbesian stick into the Lockean bundle." *Palazzolo,* 553 U.S. at 627. The Court's next words are worth quoting at length:

> Were we to accept the State's rule, the postenactment transfer of title would absolve the State of its obligation to defend any action restricting land use, no matter how extreme or unreasonable. A State would be allowed, in effect, to put an expiration date on the Takings Clause. This ought not to be the rule. Future generations, too, have a right to challenge unreasonable limitations on the use and value of land.

*Id.* Moreover, the Court said—with eerie prescience, given the facts of this case—such a rule would cause a problem even for owners at the time of enactment (like Ms. Kiser, from whom Lozman acquired the property). "Should an owner attempt to challenge a new regulation, but not survive the process of ripening his or her claim (which, as this case demonstrates, will often take years), under the proposed rule the right to compensation may not be asserted by an heir or successor, and so may not be asserted at all." *Id.* That rule, which is the rule the district court effectively adopted here, "work a critical alteration to the nature of property, as the newly regulated landowner is stripped of the ability to transfer the interest which was possessed prior to the regulation." *Id.* But the "State may not by this means secure a windfall for itself." *Id.*

And that, let us be clear, is *exactly* what the City of Riviera Beach is trying to do. At the time it enacted its land-use plan, the city insisted successfully that challenges to it were not ripe until some later date (that's *Shillingburg*). Now, the

city is insisting that it is too late for anyone to challenge the plan, because by this point, they surely knew about its restrictions when they acquired the property. If this works, the City of Riviera Beach will have succeeded in turning a huge portion of land into a public nature preserve, without ever paying *anyone* a *dime*. That, the Court said in *Palazzolo*, the city may not do. "A blanket rule that purchasers with notice have no compensation right when a claim becomes ripe is too blunt an instrument to accord with the duty to compensate for what is taken." *Palazzolo*, 533 U.S. at 628.

## IV.  LOZMAN'S LAND RETAINS NO ECONOMICALLY PRODUCTIVE USE.

The district court also concluded, almost as an afterthought, that Lozman had not been deprived of all economically productive uses of his property. Order 20–21. The district court reasoned that "a *Lucas* taking also requires an owner to be denied all economically productive or beneficial uses of land beyond what the relevant background would dictate," and that Lozman had not satisfied this element because his "narrow strip of dry land" was "likely worth more than he paid." Order 20–21. Thus, the district court said, the "value of his property has not been wholly eliminated." Order 21. That conclusion, however, is inconsistent with the facts of *Lucas*.

The test for a taking under *Lucas* is whether the government has eliminated "all economically beneficial or productive *use* of land." *Lucas*, 505 U.S. at 1015

32

(emphasis added). The question is the *uses* to which the land can be put, not the raw dollar amount for which it could be sold: "The cases say, repeatedly and unmistakably," that a ""statute regulating the uses that can be made of property *effects a taking if it denies an owner economically viable use of his land.*" *Id.* at 1016 n.6 (quoting *Keystone Bituminous Coal Ass'n v. DeBenedictis*, 480 U.S. 470 (1987)) (emphasis in original; internal alterations and quotation marks omitted). That is because "total deprivation of beneficial *use* is, from the landowner's point of view, the equivalent of a physical appropriation." *Lucas*, 505 U.S. at 1017 (emphasis added). "For what is the land but the profits thereof?" 1 E. Coke, Institutes, ch. 1, § 1 (1st Am. ed. 1812). Regulations that "leave the owner of land without economically beneficial or productive options for its use" — "*typically, as here, by requiring land to be left substantially in its natural state*" — require compensation; put differently, when the owner of real property "has been called upon to sacrifice *all* economically beneficial uses in the name of the common good, that is, to leave his property economically idle, he has suffered a taking." *Lucas*, 505 U.S. at 1018–19.

There is no doubt that Lozman's land is required to be left economically idle. The city of Riviera Beach will not allow him to live on his property, provide electrical service to it, permit the construction of a fence around it, or, really, anything else. As Ordinance 4147 makes clear, the only real *use* the city will permit

33

is the construction of a small viewing dock—that is, Lozman is allowed to stand on his property and look at it. The other permitted uses in Ordinance 4147 are "mitigation" and "conservation," which is to say, they are not "uses" at all, but ways in which the land may be left (in *Lucas'* words) "idle."

The facts of *Lucas* are, in every material respect, identical to Lozman's. *Lucas* purchased a parcel of land on the beachfront—same here. *Id.* at 1008. At the time he did, it was permissible to use it for, and develop, single-family housing—same here. *Id.* A few years later, the state (for conservation reasons) designated the land as part of a "critical area" in which the construction of any building in which a person could live was "flatly prohibited"—same here. *Id.* at 1008–09. This construction ban rendered Lucas' land "valueless"—same here. *Id.* at 1020. But, the Supreme Court said, any "limitation so severe" cannot be "legislated or decreed" unless the government pays compensation. *Id.* at 1029. Same here.

If the district court's rule were correct, there would be nothing left of *Lucas*, because *all* land retains some residual economic value, even in an economically idle state; the facts of this very case demonstrate that. Put differently, it is not that nature preserves have no *value*; it is that they are not economically *productive uses of the land.* Rather, they are for the general benefit of the public's interest in conservation. Therefore, if the state wishes to establish one for the benefit of the public, it must

pay to acquire the property, rather than insisting the landowner bear the full brunt of the cost.

## CONCLUSION

The judgment of the district court should be vacated, and the case should be remanded for a trial on the measure of damages.

Respectfully submitted,

By: */s/ Kerri L. Barsh*
    Kerri L. Barsh

Greenberg Traurig, P.A.
Wells Fargo Center, Suite 4400
333 Southeast Second Avenue
Miami, Florida 33131
Telephone: 305.579.0500
barshk@gtlaw.com

Ian Samuel
Ste. Monique Appellors LLC
1476 Springfield Way
Upland, CA 91786
Telephone: 917.803.8609
ian@stemonique.com

*Counsel for Fane Lozman*

## CERTIFICATE OF COMPLIANCE

1.    This brief complies with the type-volume limit of Fed. R. App. P. 27(d)(2)(A) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f), this document contains 8,124 words.

2.    This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Times New Roman style font.

By: */s/ Kerri L. Barsh*
Kerri L. Barsh

## CERTIFICATE OF SERVICE

I certify that on August 25, 2023, I electronically filed the foregoing with the Clerk of Court using the CM/ECF and that the foregoing document is being served this day on all counsel of record via transmission of Notices of Electronic Filing generated by CM/ECF.

By: */s/ Kerri L. Barsh*
Kerri L. Barsh