Case No. 23-11119

# In the United States Court of Appeals for the Eleventh Circuit

_____

FANE LOZMAN,

*Plaintiff-Appellant,*

v.

CITY OF RIVIERA BEACH, FLORIDA,

*Defendant-Appellee.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA

---

**APPELLEE'S BRIEF**

---

Amy Taylor Petrick, Esq.
Andrew J. Baumann, Esq.
Lewis, Longman, and Walker, P.A.
360 S. Rosemary Avenue
Suite 1100
West Palm Beach, Florida 33401
Telephone: 561-701-8538
Facsimile: 561-640-8202
apetrick@llw-law.com

*Counsel for City of Riviera Beach*

## <u>CERTIFICATE OF INTERESTED PERSONS AND</u>
## <u>CORPORATE DISCLOSURE STATEMENT</u>

Pursuant to Fed. R. App. P. 26.1 and Eleventh Circuit Rule 26.1-1, Appellee submits this list, which includes the trial judge, and all attorneys, persons, associations of persons, firms, partnerships or corporations that have an interest in the outcome of this review:

1.    Barsh, Kerri L., Greenberg Traurig, P.A., *Counsel for Appellant*

2.    Baumann, Andrew J., Lewis, Longman & Walker, P.A., *Counsel for Appellee*

3.    Birman, Oliver M., Perlman Bajandas Yevoli, *Counsel for Appellant*

4.    City of Riviera Beach, *Appellee*

5.    Lozman, Fane, *Appellant*

6.    Middlebrooks, Judge Donald M., United States District Court, Southern District of Florida, *District Court Judge*

7.    Morgan, Telsula C., Lewis, Longman & Walker, P.A., *Counsel for Appellee*

8.    Nathanson, Philip J., Trial and Appellate, *Counsel for Appellant*

9.    O'Boyle, Jonathan, The O'Boyle Law Firm, *Counsel for Appellant*

10.    Petrick, Amy Taylor, Lewis, Longman & Walker, P.A., *Counsel for Appellee*

11.    Polito, Paul J., Lewis, Longman & Walker, P.A., *Counsel for Appellee*

12.    Ryan, James D., Ryan Law Group, PLLC, *Former Counsel for Appellant*

13.    Samuel, Ian, Ste. Monique Apellors, LLC, *Counsel for Appellant*

14.    Wynn, Dawn S., City of Riviera Beach, *Counsel for Appellee*

This case does not involve any non-governmental corporations. Appellant is

an individual and Appellee is a Florida municipality.

## <u>STATEMENT REGARDING ORAL ARGUMENT</u>

Appellee City of Riviera Beach requests oral argument in this case. The factual gravamen of this case extends over decades.  Similarly, Appellant's inverse condemnation claim, if successful, would have far-reaching application to one of South Florida's most significant environmental resources, the Lake Worth Lagoon, the protection of which is statutorily required, as well as significant financial ramifications to a local government for fulfilling the comprehensive plan requirements imposed on it by the State of Florida.

# **TABLE OF CONTENTS**

Certificate of Interested Persons and Corporate Disclosure Statement……..……i-ii

Statement Regarding Oral Argument………………………………..……..iii

Table of Contents……………………………………………….……iv

Table of Citations…………………………………………..…..vi

Statement of the Issues………………………………………1

Statement of the Case……………………………………...1

Summary of Argument……………………………………...14

Argument…………………………………………………16

    I.    THE DISTRICT COURT CORRECTLY GRANTED SUMMARY JUDGMENT BASED ON THE CITY'S COMPREHENSIVE PLAN, WHICH HAS EXISTED FOR DECADES AND HAS ALWAYS BARRED FILLING AND RESIDENTIAL DEVELOPMENT OF THE PROPERTY OWNER'S SUBMERGED LAND, RENDERING THE PROPERTY OWNER'S INVERSE CONDEMNATION CLAIMS UNTIMELY, NOTWITHSTANDING THE DECISION IN *PALAZZOLO V. RHODE ISLAND*, 533 U.S. 606 (2001)……………16

    II.    THE UNITED STATES' NAVIGATIONAL SERVITUDE SEVERELY LIMITS THE SUBMERGED PROPERTY'S DEVELOPMENT POTENTIAL AND THE UPLAND PARCEL HAS NOMINAL VALUE BY ITSELF…………………..…………..22

    III.    FLORIDA'S "PUBLIC TRUST DOCTRINE" APPLIES TO LOZMAN'S SUBMERGED LAND BECAUSE IT IS A "NAVIGABLE WATER" UNDER FLORIDA LAW………………24

IV.    THE DISTRICT COURT CORRECTLY ACKNOWLEDGED THAT THE CITY'S ACTIONS DID NOT STRIP THE PROPERTY OF ITS ECONOMICALLY BENEFICIAL OR PRODUCTIVE USE, EVEN THOUGH IT MAY NOT BE FILLED AND RESIDENTIALLY DEVELOPED WITHOUT JUDICIAL ACKNOWLEDGEMENT OF VESTED RIGHTS AND STATE AND FEDERAL PERMITS, BECAUSE ITS ECONOMIC VALUE HAS NOT CHANGED AS A RESULT THE CITY'S ACTION AND BECAUSE THE PROPERTY STILL HAS PASSIVE USES, INCLUDING MINOR DEVELOPMENT SUCH AS DOCKS AND VIEWING PLATFORMS, THE ECONOMIC VALUE OF WHICH HAS BEEN RECOGNIZED BY THE REAL ESTATE MARKET.......................27

Conclusion………………………………………………………...…….30

Certificate of Compliance…………………………………………...……..30

Certificate of Service……………………………………………...……….31

## <u>TABLE OF AUTHORITIES</u>

**Cases**                                                                                          **Page**

*Baker v. State ex rel. Jones*, 87 So. 2d 497 (Fla. 1956)……………...…………25

*Broward v. Mabry*, 50 So. 826 (Fla. 1909)……………………………………25, 27

*City of Riviera Beach v. Shillingburg*,
    659 So.2d 1174 (Fla. 4th DCA 1995)…………………………………3, 5, 17

*Clement v. Watson*, 58 So. 25 (Fla. 1912)…………………………………………25

*Eide v. Sarasota County*, 908 F.2d 716 (11th. Cir. 1990)…………………………18

*Florida Board of Trustees of the Internal Improvement Fund v.*
    *Wakulla Silver Springs Co.*, 362 So. 2d 706………………….……...……..26

*Florida League of Cities, Inc. v. Admin. Com'n*,
    586 So. 2d 397 (Fla. 1st DCA 1991)…………………………….…...…...3

*Good v. U.S.*, 39 Fed. Cl. 81 (Fed. Cir. 1997)……………………………….…28

*Guggenheim v. City of Goleta*, 638 F.3d 1111 (9th Cir. 2018)……………….20, 21

*Hillcrest Property, LLP v. Pasco County*,
    731 F. Supp.2d 1288 (M.D. Fla. 2010)…………………………….……19

*Lingle v. Chevron U.S.A. Inc.*, 544 U.S. 528 (2005)……………………...…28

*Lost Tree Vill. Corp. v. United States*, 115 Fed. Cl. 219 (2014), aff'd,
    787 F.3d 1111 (Fed. Cir. 2015)….…………………………………...…….29

*Lozman v. City of Riviera Beach*, 568 U.S. 115 (2013)……………….………10

*Lucas v. South Caroline Coastal Council*, 505 U.S. 1003 (1992)……...….12, 28, 29

*Martin v. Busch*, 93 Fla. 535, 112 So. 274 (1927)……………………….………..27

*Mech v. Sch. Bd. of Palm Beach Cnty., Fla.*, 806 F.3d 1070 (11th Cir. 2015)…....14

*Mojito Splash, LLC v. City of Holmes Beach*,
    326 So. 3d 137 (Fla. 2d DCA 2021)…………………………………………..18

*Monroe Equities, LLC v. State*, 4 N.Y.S.3d 816 (N.Y. Ct. Cl. 2014)………..….…21

*Odom v. Deltona Corp.*, 341 So.2d 977 (Fla. 1976)…………………..……25, 26

*Palazzolo v. Rhode Island*, 533 U.S. 606 (2001)…………………………..14, 20, 21

*Palm Beach Isles Associates v. United States*,
    208 F.3d 1374 (Fed. Cir. 2000)……………………………………….. 22, 23

*Pinecrest Lake Inc. v. Shidel*, 795 So.2d 191 (Fla. 4th DCA 2001…….…..…4, 17, 19

*Rozar v. Mullis,* 85 F.3d 556 (11th Cir. 1996)……………………………………..14

*Singer Island Civic Ass'n*, 2002 WL 1774298 at *13
    (Fla. Dep't of Env. Prot. Nov. 16, 2001)…………………………....7, 27

*South Grande View Development Company, Inc.*,
    1 F.4th 1299 (11th Cir. 2021)…………………………………………..18, 19

*Southwest Ranches Homeowners Ass'n v. Broward County*,
    502 So.2d 931 (Fla. 4th DCA 1987)………………………..…………19

*State of Florida Dep't of Env't Prot. v. Lozman*, No. 2021-CA-004564,
    2022 WL 7895753, (Fla.Cir.Ct. June 30, 2022)……………………..……8

*Stensrud v. Rochester Genesee Reg'l Transp. Auth.*,
    507 F. Supp. 3d 444 (W.D.N.Y. 2020)…………………………..……19

*Taylor v. City of Riviera Beach*,
    801 So. 2d 259 (Fla. 4th DCA 2001)…………………………...4, 5, 17, 19

*United States v. Lozman*, No. 21-cv-811119………………………..8, 9, 22, 23, 24

*Wallace v. Kato*, 549 U.S. 384, 387 (2007)…………………………………19, 20

**Statutes**

§95.11(3)(h), Florida Statutes (2022)……………………………………………..20

§163.3194, Florida Statutes (2022)……………………………………..……2, 17

Section 163.3215, Florida Statutes (2022)……………………………………….2

Section 403.813(1)(b), Florida Statutes (2023)…………………………………13

Sections 403.9321-403.9333, Florida Statutes……………………….…………23

**Other Authorities**

Art. X, §11, Fla. Const……………………………………………….……..6

*In Accordance with A Comprehensive Plan: The Rise of*
    *Strict Scrutiny in Florida*, 6 J. Land Use & Envtl. L. 79, 87 (1990)……..…..2

Florida Administrative Code Rule 62-330.051(5)(B)……………………………..13

Section 10 of the Rivers and Harbors Act………………………………………8, 22

## STATEMENT OF THE ISSUES

Whether the existence of Appellee, City of Riviera Beach, Florida's ("the City") comprehensive plan for decades prior to Appellant Fane Lozman's purchase of his property, which restrained filling and residential development of the property without state and federal permits and a judicial determination of vested rights renders Lozman's claim untimely. Whether Lozman's development potential is restrained by the federal navigational servitude and Florida's Public Trust Doctrine, such that Lozman had no underlying right to fill his submerged land in the Lake Worth Lagoon.  Whether the District Court correctly determined that the City did not deprive Lozman of all economically beneficial or productive use of his property, where the undisputed record evidence proved that the property's market value was several times higher than Lozman's purchase price approximately ten years prior.

## STATEMENT OF THE CASE

In 1989, the City of Riviera Beach ("the City") adopted its comprehensive plan ("the Plan."), as required by Chapter 163, Part II, Florida Statutes. DE 134-7.[1] Comprehensive plans are likened to the local government's "constitution" regarding development, while zoning laws (referred to as "land development regulations") are compared to the local government's "statutes" governing development. Section

---

[1] Record references to pleadings and other court papers are made by referring to the document entry number and the page number within the document.

163.3194(1)(a), Florida Statutes, specifically provides that "[a]fter a comprehensive plan, or element or portion thereof, has been adopted in conformity with this act, *all* development undertaken by, and all actions taken in regard to development orders by, governmental agencies in regard to land covered by such plan or element *shall be consistent* with such plan or element as adopted." (Emphasis added). Likewise, subsection (b) of the same statutory provision explains in the case of conflict between a comprehensive plan provision and a land development regulation, the following rules apply:

> (1)(b) All land development regulations enacted or amended shall be consistent with the adopted comprehensive plan. . . . During the interim period when the provisions of the most recently adopted comprehensive plan, or element or portion thereof, and the land development regulations are inconsistent, **the provisions of the most recently adopted comprehensive plan, or element or portion thereof, shall govern any action taken in regard to an application for a development order**.

§163.3194, Fla. Stat. (2022) (emphasis added).

Consistency between the comprehensive plan and land development regulation has been required by Florida law since 1985. Jerry Mitchell, *In Accordance with A Comprehensive Plan: The Rise of Strict Scrutiny in Florida*, 6 J. Land Use & Envtl. L. 79, 87 (1990). Section 163.3215, Florida Statutes, has further enshrined the supremacy of comprehensive plan provisions over land development regulations by providing a private cause of action for affected parties to challenge any development order that is inconsistent with a comprehensive plan, regardless of

its consistency with land development regulation provisions.

At the time the City adopted the Plan, Florida's Department of Community Affairs ("DCA") had the duty to determine whether local comprehensive plans were "in compliance with the statute." A "not in compliance" finding could jeopardize state funding for the City. *Florida League of Cities, Inc. v. Admin. Com'n*, 586 So. 2d 397, 400 (Fla. App. 1991). DCA determined that the Plan was "not in compliance," because it allowed residential development of the submerged land along the east side of the Lake Worth Lagoon. DE 134-8 at Pg 13; *City of Riviera Beach v. Shillingburg*, 659 So.2d 1174, 1177 (Fla. App. 4th 1995).

DCA required the City "to revise the plan 'to establish a lower density for areas designated as preservation . . .'" *Id.* A stipulated settlement agreement between the City and DCA created the Special Preservation ("SP") Future Land Use ("FLU") designation:

> Special Preservation—mangroves, wetlands, and special estuarine bottom lands. These mangroves and special estuarine bottom lands are protected by federal, State and local agencies involved in the wetlands preservation, dredge and fill permitting, and other hydrological modifications. It is the expressed policy objective of the City to preclude any development of submerged lands, including but not limited to mangroves, wetlands, and estuarine bottom lands, to the maximum extent permissible by law. It is further the policy of the City to oppose any applications for dredge or fill permits pending before applicable State or Federal agencies. This policy objective shall not be construed, nor implemented to impair or preclude judicially determined vested rights to develop or alter submerged lands. . . .

DE 134-8 at Pg 21. The SP FLU became effective on December 19, 1991.

3

*Shillingburg*, 659 So. 2d at 1177.

Litigation regarding the SP FLU designation ensued. *Id*. at 1178. The Fourth District Court of Appeal held that the SP FLU provision did not constitute a facial taking, because it had been amended to allow a dock and left open the possibility of other uses. *Id*. at 1179. The Fourth District Court of Appeal held that any as-applied challenges were not yet ripe. *Id.* at 1180.

In August 1993, the City submitted a Plan Amendment, proposing low-density residential development in the SP FLU. *Taylor v. City of Riviera Beach*, 801 So. 2d 259, 260–61 (Fla. App. 4th 2001). DCA again objected, and the City abandoned this amendment. *Taylor*, 801 So.2d at 260-61. On May 17, 1995, the City asked DCA whether it would allow *any* development on the submerged lands and, if so, of what type and density. *Id.*; DE 134-10 at Pg 2. On August 10, 1995, DCA responded that in the absence of a judicial determination of a prior vested right to develop, *no* development of submerged lands should be allowed. *Taylor*, 801 So.2d at 260-61.

In 2001, the Florida Fourth District Court of Appeal rendered its decision in *Pinecrest Lake Inc. v. Shidel*, 795 So.2d 191, 201 (Fla. App. 4th 2001), definitively stating that **all** development orders must be consistent with comprehensive plan provisions, that such **consistency is not discretionary**, and that reviewing courts would give no deference to the local government's interpretation to its own plan in

determining whether such consistency existed. *Id.* (Emphasis added).

The same year, the Florida Fourth District Court of Appeal issued its opinion in *Taylor v. City of Riviera Beach*, 801 So. 2d 259, 260–61 (Fla. App. 4th 2001), which addressed the City's attempt to amend the Plan in 1993 and its subsequent correspondence with the DCA after *Shillingburg*. The District Court concluded that the City's decision not to amend the SP FLU after the 1993 draft amendment solidified its prohibition against residential development within the SP FLU area, and as-applied takings claims based on the SP FLU *were* now ripe. *Taylor*, 801 So.2d at 263. Thus, as of 2001, there was no doubt that the City's Plan definitively disallowed the filling and development of submerged land within the SP FLU, absent a judicially recognized vested right to fill, as the DCA required.

On October 6, 2010, the Plan was amended. DE 12-1. The 2010 amendment did not change the residential development prohibitions but permitted "private residential fishing or viewing platforms and docks for non-motorized boats" … subject to conditions. DE 134-12 at Pg 16. The 2010 Plan also provides, "[t]his policy objective shall not be construed nor implemented to impair or preclude judicially determined vested rights to develop or alter submerged lands," consistent with the DCA's 1995 correspondence[2]. *Id.*

---

[2] On December 1, 2021, the City updated the Plan to include the following language as part of the SP FLU: "For properties found to have judicially determined vested rights to develop or alter submerged lands, a density of one unit per 20 acres will be

**The Lozman Property.**

Lozman purchased the subject property from Ms. Omah Kiser, as trustee for the Renegade Trust, on February 25, 2014, for $24,000[3]. Appellant's App. 138-1 at Pg 5.  Ms. Kiser thought Lozman might use the property for his floating home.  She had no plans to develop the property herself. DE 134-3 at Pg 13; Appellant's App. 138-1 at Pg 5.

The property includes a 0.2-acre sliver of undeveloped dry land, along with submerged land beneath the Lake Worth Lagoon. DE 134-17 at 2. The acreage of the submerged portion is unclear, due to inaccuracies in the chain of title.

The State of Florida owns submerged lands under navigable waters, which is managed by its Board of Trustees of the Internal Improvement Trust Fund ("TIITF").  Art. X, §11, Fla. Const. In 1858 the Government Land Office ("GLO") surveyed the land surrounding Lake Worth. DE 134-19 at Pg 62.  At the time, Lake Worth was a large freshwater lake. Br. 18.  GLO meandered the shoreline of Lake Worth during its official government survey dated November 7, 1859, United States Government plat. DE 134-19 at Pg 62.  Lake Worth is now connected to the Atlantic

---

assigned to the property." DE 134-13 at Pg 19. Thus, properties with a vested right to fill submerged lands may develop at one residential unit per 20 acres without a plan amendment.

[3] Lozman quit claimed the property to himself as an individual on April 27, 2016. DE 134-16 at Pg 1; DE 134-4 at Pg 1.

Ocean through the Lake Worth Inlet and is known as the Lake Worth Lagoon, a tidally influenced saltwater estuary that stretches about 21 miles from north to south and varies in width from about 1 to 1 ½ miles. *Singer Island Civic Ass'n*, 2002 WL 1774298 at *13 (Fla. Dep't of Env. Prot. Nov. 16, 2001) (final order).

In 1924, TIITF executed a deed conveying approximately 311 acres of sovereign submerged land within the Lake Worth Lagoon to the Lake Worth Realty Company. DE 134-6. The TIITF Deed describes the 311 acres as "parcels, tracts, or shallow banks in Lake Worth." *Id.* The TIITF Deed describes the eastern boundary of the 311 acres as the meander line along the eastern shore of Lake Worth set by Surveyor Reyes in the 1859 United States Government plat. *Id.* The property at issue here is a portion of that 311 acres. Appellants App. 1 at Pg 2.

Healthy seagrasses were identified on the submerged portion of the property, which the City's expert biologist characterized as "high quality and productive habitat that is providing grazing for federally listed juvenile sea turtles and West Indian manatees." DE 134-5 at Pg 3.  Sea turtles were also spotted on the site.

**State and Federal Enforcement Over Unpermitted Activity.**

In 2016, Lozman placed a floating home on the property. He contends this home was destroyed by vandals. DE 134-3 at Pg 39. In 2019 or 2020, Lozman installed another floating home secured by three concrete blocks to the Lagoon's bottom.  Both the Florida Department of Environmental Protection ("FDEP") and

the U.S. Army Corps of Engineers ("USACOE") instituted enforcement actions against Lozman for this unauthorized activity. DE 134-26; Complaint, *United States v. Lozman*, No. 21-81119 (S.D. Fla. filed June 25, 2021).

The FDEP enforcement action led to a temporary injunction and final consent judgment against Lozman requiring him to remove the concrete blocks and cease the activity until he obtained a permit. *State of Florida Dep't of Env't Prot. v. Lozman*, No. 2021-CA-004564, 2022 WL 7895753, (Fla.Cir.Ct. June 30, 2022).

The USACOE filed its Notice of Violation on January 12, 2021, and instituted a civil enforcement action against the property owner under the Rivers and Harbors Appropriation Act of 1899 on June 25, 2021. *See United States v. Lozman*, No. 21-81119, 2021 WL 10257469, at *1 (S.D. Fla. Oct. 6, 2021). The USACOE alleged that Lozman built structures in waters of the United States without authorization and "created an obstruction to the navigable capacity of a water of the United States without authorization." Complaint at 1, *United States v. Lozman*, No. 21-81119 (S.D. Fla. filed June 25, 2021).

The District Court placed the case in abeyance while Lozman applied for a permit. Order Adopting Stipulation and Staying Case, *United States v. Lozman*, No. 21-81119 (S.D. Fla. Dec. 8, 2021), ECF No. 55. The USACOE never issued the permit because Lozman did not provide information requested by the USACOE. Order, *United States v. Lozman*, No. 21-81119 (S.D. Fla. June. 20, 2023), ECF No.

67; Order Granting Motion to Reopen Case, *United States v. Lozman*, No. 21-8119 (S.D. Fla. July 20, 2023), ECF No. 69.  Trial in the case is now set in that case in March, 2024. Order, *United States v. Lozman*, No. 21-81119 (S.D. Fla. July 27, 2023), ECF No. 76.

Lozman then sued FDEP and TIITF for a declaratory judgment in Florida state court, alleging that the TIITF Deed gave him the right to bulkhead and fill without any FDEP permit. DE 134-22. TIITF and FDEP moved to dismiss. DE 134-23 at Pg 4.  The Court granted the motion, ordering Lozman to pursue administrative remedies against FDEP, appeal, or file an amended complaint. DE 134-24 at Pg 1. Lozman dismissed his case and never applied for a FDEP permit or completed the federal permit application. DE 134-2 at Pg 52; DE 134-3 at Pgs 65-66; DE 134-25.

**The Inconsistent Zoning Classification and Ordinance 4147.**

The property has been designated as SP FLU since the 1990s. DE 134-1; DE 134-14 at Pg 2.  However, when Lozman purchased the property it bore an outdated residential zoning designation that allowed for five units per acre, like other, similar properties in the area. Appellant's App. 1 at Pg 3.

To resolve the inconsistency, the City adopted Ordinance 4147 on July 8, 2020, creating a SP zoning district that matching the SP FLU designation. DE 134-15 at Pg 5. The SP zoning district is virtually identical to the SP FLU policy, including the same "savings clause" and allowing the same "private residential

9

fishing or viewing platforms and docks for non-motorized boats" as well as uses for mitigation banks and preservation land. DE 134-15 at Pg 4.

**Lozman Failed to Apply for Permits from the City.**

Lozman did not apply to the City for permission to fill the property, rezone it, or change the property's Future Land Use designation. DE 134-14 at Pg 2. He never applied to establish any residential use on the property, or to build a dock or observation platform, before or after Ordinance 4147.  DE 134-14 at Pg 2.

**The Floating Structure Ordinance.**

On September 15, 2021, the City adopted Ordinance 4178 to address floating structures and live-aboard vessels throughout the City, in light of *Lozman v. City of Riviera Beach*, 568 U.S. 115 (2013). DE 144-8. Ordinance 4178 generally prohibits the mooring of floating structures within the waters of the City, but includes exceptions that permit private mooring expressly permitted by state, federal, and local law and done consistent with permits obtained by state and federal agencies. DE 144-8 at §13-53(a)-(g); §13-55.  Lozman never asked the City whether he may moor a floating structure on his property, pursuant to the exceptions in Ordinance 4178, or provided the City with permits establishing the applicability of the exception.

**The Property Has Economic Benefit and Value In Excess of His Purchase Price.**

Lozman obtained an appraisal by John Underwood valuing the property at

$49,833,500 if it could have been completely bulkheaded, filled, subdivided, and sold as 8 residential lots. DE 130-4 at Pg 8; DE 130-5 at Pg 64. The appraisal depended on the hypothetical condition – a condition that is contrary to what is known –that all permits required to fill and bulkhead the entire 8 acres were granted without conditions. DE 130-4 at Pgs 2, 6; DE 130-5 at Pgs 35-36. Mr. Underwood did not consider any other regulatory development requirements that might affect the property's development potential, or whether subdivision was technically feasible. DE 130-5 at Pgs 18, 19, 37, 39. Lozman never obtained engineered drawings, analyses of natural resources or water flow, which FDEP would require to issue a permit. DE 134-30 at Pgs 3-4; DE 134-2 at Pg 52. Mr. Underwood also did not calculate a property value after Ordinance 4147 was enacted, did not evaluate use for a floating home or consider any other use, other than the "hypothetical condition." DE 130-5 at Pgs 25, 40.

The City retained expert appraiser Mr. Robert Banting, who *did* value the property both before and after the adoption of Ordinance 4147, using comparable sales for similar submerged properties for uses like mitigation, conservation, and passive recreation both before and after the property owner's purchase and before and after Ordinance 4147. DE 134-31 at Pgs 41, 46, 49, 56, 65-68. With a highest and best use of passive recreation, mitigation, and conservation, Mr. Banting valued the property at $130,000 or $170,000, depending on the amount of submerged

acreage. DE 134-31 at Pgs 5-6.

**Procedural History of the Case.**

Lozman filed suit on January 24, 2022. Appellant's App. 1. Lozman claimed a taking under *Lucas v. South Carolina Coastal Council*, 505 U.S. 1003, 1015 (1992), alleging that the City's adoption of Ordinance 4147 prevented him from filling, subdividing, and developing his property for resale as residential lots, and rendered the property valueless. Appellant's App. 1 at Pgs 5-6. Lozman alleged that he intended to temporarily use the property to moor a floating home but did not allege a taking based on Ordinance 4148. Appellant's App. 1 at Pg 7.

After discovery, both parties filed motions for summary judgment. DE 135; DE 137. In opposition to the City's motion for summary judgment, Lozman filed an unsworn affidavit on December 28, 2022, reciting significant factual and legal history outside his personal knowledge, as well as undisclosed expert opinions, and attaching unauthenticated documents that had not been produced in discovery, but which are referenced at length in his initial brief. Appellant's App. 138-1. The City filed a motion to strike the affidavit on December 31, 2022.[4] DE 152.

**Lozman's Motion to Supplement The Record.**

Oral argument on the cross motions for summary judgment was held on

---

[4] The Court denied the motion as moot, based on its order granting the City summary judgment. Appellant's App. 198.

February 9, 2023. Appellant's App. A. Lozman filed a motion to supplement the summary judgment record on February 17, 2023. DE 193.

Lozman sought to submit a letter from the State of Florida to a different property owner (Daniel Taylor) for a different property. DE 193-1. The letter from the State represented regulatory review of whether the size and dimensions of a dock/walkway met the exempt activity provisions of Florida Administrative Code Rule 62-330.051(5)(B).

Rule 62-330.051(5)(B) provides that private docks are exempt from permitting if the dock does not exceed a certain size and is not used for residential or commercial purposes.  Section 403.813(1)(b), Florida Statutes, identifies exempt docking facilities, including those "used for recreational, noncommercial activities. . . ." §403.813, Fla. Stat. (2023). Accordingly, the letter does not prove that docks for residential activity are allowed without a permit.

Lozman also sought admission of a USACOE permit issued to Mr. Taylor, allowing the construction of a dock of less than 1,000 square feet on private submerged land. DE 193-2. The permit does not refer to filling submerged land or to mooring a floating home. DE 193-2 at Pg 1.  Lozman further sought admission of a record to show the FDEP case was disposed of by stipulation.  DE 193-3.

The District Court granted the motion to supplement over the City's objection on March 6, 2023, noting that the District Court would resolve the relevance of the

material in its order on the cross-motions for summary judgment. DE 196.

**The Ruling.**

On April 3, 2023, the Court granted the City's motion for summary judgment and denied Lozman's motion for summary judgment. DE 196; Appellant's App. 197. The City was awarded final judgment the following day. Lozman timely appealed on April 6, 2023. Appellant's App. 198.

**Standard of Review.**

The Court's order awarding summary judgment to the City is reviewable by this Court *de novo*, and this Court can affirm a summary judgment on any alternative ground fairly supported by the record. *Mech v. Sch. Bd. of Palm Beach Cnty., Fla.*, 806 F.3d 1070, 1074 (11th Cir. 2015) *citing Rozar v. Mullis,* 85 F.3d 556, 564 (11th Cir. 1996).

## SUMMARY OF THE ARGUMENT

Lozman's inverse condemnation claim based on the City's restrictions on filling and residential development of his submerged property is barred. These restrictions have existed since the 1990s when the City adopted the amended version of the Plan. Florida courts have acknowledged the non-discretionary nature of the Plan, as well as the right to bring an inverse condemnation claim against the Plan since 2001, more than a decade before Lozman took ownership in 2014. Lozman's claim has no relationship to the holding in *Palazzolo v. Rhode Island*, 533 U.S. 606

(2001). In *Palazzolo*, the form of ownership was altered from corporate to individual ownership **during** the time when the as-applied takings claim ripened. By contrast, the statute of limitations on a facial takings claim against the City's SP development restrictions expired before Lozman took ownership of the property in an arms-length transaction, and the prior owner made no attempt to the develop the property.

The District Court also properly held that Lozman's submerged land is within navigable waters of the United States and is subject to the United States' navigational servitude. Although Lozman claims that he still retains a portion of upland outside of the navigational servitude, the upland is only a 0.2-acre sliver of upland with protected mangroves with nominal value. Lozman claims that he can acquire permission from the USACOE to fill his land. Yet, he has never submitted a complete permit application to the USACOE or the FDEP to fill his submerged land and the USACOE has denied a similar application in the Lake Worth Lagoon.

Additionally, Florida's public trust doctrine applies to Lozman's submerged land because it is a "navigable water" under Florida law. Lake Worth was a meandered freshwater lake in 1858. Under Florida law it is presumed to have been "navigable-in-fact" at Florida's statehood with the potential for commerce. Lozman has provided no material evidence to the contrary.

The property's market value has risen by several times its purchase price, even in its regulated state. Despite the property's rise in value, Lozman claims that the

City's restraint on residential development of the submerged lands represents a total taking because he cannot use the property in his preferred economically beneficial way. However, diminution in market value is how courts determine whether available uses for the property are economically beneficial. Here, while the remaining uses do not contemplate significant construction, the undisputed evidence is that those uses still have market value. Therefore, the District Court correctly held that the City did not deprive Lozman of his economically beneficial or productive use of the property.

## ARGUMENT

I. THE DISTRICT COURT CORRECTLY GRANTED SUMMARY JUDGMENT BASED ON THE CITY'S COMPREHENSIVE PLAN, WHICH HAS EXISTED FOR DECADES AND HAS ALWAYS BARRED FILLING AND RESIDENTIAL DEVELOPMENT OF THE PROPERTY OWNER'S SUBMERGED LAND, RENDERING THE PROPERTY OWNER'S INVERSE CONDEMNATION CLAIMS UNTIMELY, NOTWITHSTANDING THE DECISION IN *PALAZZOLO V. RHODE ISLAND*, 533 U.S. 606 (2001).

Lozman now contends that the City's comprehensive plan forms the basis for the allegedly confiscatory event. The City agrees that the substantive restriction on residential development of the property was enacted, in the 1990s when the Plan was amended to include the SP FLU. This makes Lozman's claim untimely.

The District Court held that the City's Plan is paramount and non-discretionary. Appellant's App. 197 at Pg 5. This principle has been well settled in

16

Florida law as far back as 2001 when the Florida Fourth District Court of Appeal's decision in *Pinecrest Lake Inc. v. Shidel*, 795 So.2d 191, 201 (Fla. App. 4th 2001), definitively resolved the non-discretionary nature of the statutory requirement that development orders be consistent with the comprehensive plan. *See also* §163.3194, Fla. Stat. (2022)(mandating conformity of all development undertaken after a comprehensive plan has been adopted). Likewise, Florida law expressly provides that where an outdated zoning code is inconsistent with a later enacted comprehensive plan, "the provisions of the most recently adopted comprehensive plan, or element or portion thereof, *shall* govern. . . . §163.3194(1)(b), Fla. Stat. (2022) (emphasis added).

Lozman claims that the Florida Fourth District Court of Appeal's opinion in *City of Riviera Beach v. Shillingburg*, 659 So.2d 1174, 1178-79 (Fla. App. 4th 1995), means the City had "flexibility" regarding development of the property, the Plan notwithstanding. This argument ignores both existing Florida law as to how comprehensive plans must be applied and the Court's later decision in *Taylor v. City of Riviera Beach*, 901 So.2d 259, 263 (Fla. App. 4th 2001). The *Taylor* Court acknowledged that the City's efforts to amend the Plan after *Shillingburg* and its ultimate decision to retain its prohibition against residential development for SP FLU-designated property. The *Taylor* court concluded that a takings claim

17

challenging the SP FLU designation ripened thirteen years before Lozman's purchase. *Taylor*, 901 So.2d at 263.   Ordinance 4147 changed nothing.

A similar situation was addressed by the Florida Second District Court of Appeal in the case of *Mojito Splash, LLC v. City of Holmes Beach*, 326 So. 3d 137 (Fla. App. 2d 2021). In *Mojito Splash*, the City adopted a comprehensive plan that set forth occupancy rate limits for vacation rentals. *Mojito Splash,* 326 So. 3d at 138. After the plan was adopted, a landowner purchased a property for vacation rental use. *Id.* at 139. A zoning ordinance was then adopted limiting the occupancy rate, consistent with the comprehensive plan. *Id.* The landowner sued, claiming it was inordinately burdened by the zoning change because it was no longer able to meet its reasonable investment-backed expectations. *Id.* at 139-140.  The Second District Court of Appeal disagreed, holding that the zoning change to conform with the comprehensive plan did not itself burden the property, since the comprehensive plan had always restricted the occupancy rate. *Id.* at 141.

Lozman claims that a comprehensive plan, standing alone, can never be the basis for a takings claim, citing two inapposite cases – *Eide v. Sarasota County*, 908 F.2d 716 (11th. Cir. 1990) and *South Grande View Development Company, Inc.*, 1 F.4th 1299 (11th Cir. 2021). Neither case supports Lozman's claim.

*Eide* was not an inverse condemnation case. *Eide*, 908 F.2d at 723. Instead, *Eide* involved a facial challenge based on a claim of arbitrary and capriciousness.

*Id.* at 724. *Eide* also predated *Pinecrest Lakes*, which resolved the binding supremacy of comprehensive plans. *Pinecrest Lakes*, 795 So.2d at 198.

Instead, *Eide* relied on the conclusion in *Southwest Ranches Homeowners Ass'n v. Broward County*, 502 So.2d 931, 935 (Fla. App. 4th 1987), that the comprehensive plan is not the "sole, controlling document with which subsequent plan elements ha[ve] to comply." *Eide*, 908 F.2d at 727. Thus, once *Pinecrest Lakes* was decided, *Eide* can no longer be read to prohibit a facial takings claim against a Florida comprehensive plan (if it ever could have been read to support such a notion.) For owners of submerged land within the SP FLU designation, the Florida Fourth District Court of Appeal's decision in *Taylor* provided specific notice that a takings claim would lie based on the comprehensive plan. *Taylor*, 901 So.2d at 263.

*South Grande View* provides no greater support for Lozman's attempt to revive his stale claim against the SP FLU. *South Grande View* is a case construing Alabama law, and addressed a rezoning, rather than a comprehensive plan provision. *South Grande View*, 1 F. 4th at 1302. By contrast, the Middle District Court of Florida has acknowledged that a facial challenge to a comprehensive plan adopted under Florida law ripens when the plan is first adopted. *Hillcrest Property, LLP v. Pasco County*, 731 F. Supp.2d 1288, 1295 (M.D. Fla. 2010).

State law determines the statute of limitations for inverse condemnation cases. *Wallace v. Kato*, 549 U.S. 384, 387 (2007); *see Stensrud v. Rochester Genesee Reg'l*

*Transp. Auth.,* 507 F. Supp. 3d 444, 450 (W.D.N.Y. 2020)(applying *Wallace v. Kato,*
549 U.S. 384, 387 (2007) to takings claims under the Fifth and Fourteenth
Amendments). In Florida, inverse condemnation claims must be brought within four
years of the act of taking. §95.11(3)(h), Fla. Stat. (2022). Since the SP FLU was
adopted in 1991, Lozman or his predecessor-in-interest, would have had to bring this
claim within four years of the adoption of the SP FLU provisions – or by 1995 – not
2022. Even if one were to delay the ripening of the claim until the holdings of
*Pinecrest Lakes* and *Taylor,* Lozman's claims are still untimely by decades.

    Lozman contends that he fits within the holding in *Palazzolo v. Rhode Island,*
533 U.S. 606 (2001), which held that successors-in-interest are not barred from
lodging inverse condemnation claims for confiscatory acts that took place while the
takings claim was ripening and before the successor-in-interest took title. The
differences between Lozman and the plaintiff in *Palazzolo* are stark. *Palazzolo*
addressed a change in ownership that took place while the takings claim ripened –
the original owner had its corporate charter revoked and Palazzolo took ownership
as the corporation's sole shareholder. *Palazzolo,* 533 U.S. at 614. The Ninth Circuit
Court in *Guggenheim v. City of Goleta,* 638 F.3d 1111, 1119 (9th Cir. 2018),
explained,

> *Palazzolo* holds that an owner who acquires title to property during the
> period required for an as applied regulatory taking to ripen (in that case
> during proceedings on applications to build on wetlands) is not
> necessarily barred from bringing the action when it ripens even though

he did not own the property when the regulation first started to be applied to the property. This difference matters because an as applied challenge necessarily addresses the period during which the administrative or judicial proceedings for relief occur, so justice may require that title transfers during the ripening period not bar the action. By contrast, there is no such extended period applicable to a facial challenge, because the only time that matters is the time the ordinance was adopted.

….

One reason why these distinctions matter is that even though in *Palazzolo* title passed to the plaintiff after the land use restriction was enacted, he acquired his economic interest as a 100% shareholder in the corporation owning the land before the land use restriction was enacted, and title shifted to him because his corporation was dissolved, not because he bought the property for a low price reflecting the economic effect of the regulation.

*Guggenheim,* 638 F.3d at 1118.

Neither Lozman nor his predecessor-in-interest ever applied to the City for development approval or attempted to ripen an as-applied challenge as in *Palazzolo*. To the contrary, Lozman is just the type of successor-in-interest referred to in *Guggeheim*, one who was able to buy the property for a low price reflecting the economic effect of the 1991 Plan's regulation. *Id.* Therefore, Lozman's claim is not revived by *Palazzolo. See Monroe Equities, LLC v. State*, 4 N.Y.S.3d 816, 823-24 (Ct. Cl. 2014)(holding that *Palazzolo* does not hold that pre-purchase regulation can never be a background principle of state law and concluding that *Palazzolo* addressed a change in the form of ownership by the same title holder, rather than a change in ownership).

21

II.    THE UNITED STATES' NAVIGATIONAL SERVITUDE
SEVERELY LIMITS THE SUBMERGED PROPERTY'S
DEVELOPMENT POTENTIAL AND THE UPLAND PARCEL HAS
NOMINAL VALUE BY ITSELF

As noted by the District Court, the United States contends that the Lake Worth

Lagoon is a navigable water of the United States within the meaning of section 10

of the Rivers and Harbors Act. Complaint, *United States v. Lozman*, No. 21-81119

(S.D. Fla. filed June 25, 2021); Appellant's App. 197 at Pg 12; DE 152.  Lozman

notes that the navigational servitude does not extend beyond the high-water mark

and that Lozman owns a thin strip of dry land amounting to roughly a quarter-acre.

Br. 21.  Lozman thus claims that Riviera Beach is responsible for depriving him of

the right to develop the sliver of upland.  *Id.*

In *Palm Beach Isles Assoc. v. United States*, 208 F.3d 1374, 1381 (Fed. Cir.

2000), *aff'd on reh'g*, 231 F.3d 1354 (Fed. Cir. 2000), property owners of 1.4 acres

of shoreline wetlands and 49.3 acres of submerged land in the Lake Worth Lagoon

filed an inverse condemnation suit against the United States, after USACOE denied

a permit to fill the submerged lands. *Id.* at 1377-78.  The Federal Circuit found that

without development of the 49.3 acres of submerged land, the 1.4 acres of adjoining

wetlands would be of little, if any, value. *Id.* at 1386.  The court determined that if

there is no taking because of the navigational servitude, "the developmental value of

the adjacent wetland strip standing alone would be at most nominal. . . and in any event PBIA has failed to establish that no other uses are available to it." *Id.*

Here, Lozman's sliver of upland borders the eastern shore of the Lake Worth Lagoon. DE 134-19 at Pg 2. The upland is only 20 feet wide and 300 feet long, and contains sea grapes and mangroves. DE 134-5 at Pg 16. Florida law strictly regulates altering mangroves and prohibits the trimming of mangroves beyond statutory parameters. §§ 403.9321-403.9333, Fla. Stat. (2022). Thus, the developmental value of the upland strip standing alone is negligible, and Lozman has never established an available use for his sliver of upland. Therefore, as in *PBIA*, Lozman's upland is of nominal value since the United States' navigational servitude applies to the remainder of Lozman's submerged land.

The United States' current suit against Lozman is based on his obstructions to the navigable capacity of the Lake Worth Lagoon. Complaint, *United States v. Lozman*, No. 21-81119 (S.D. Fla. filed June 25, 2021). Lozman contends that private property within the navigable waters of the United States can be put to economically productive use if the landowner secures the permission of the USACOE. Br. 14. However, Lozman has never filed a complete application for a fill permit from the USACOE. DE 134-3 at Pg 68-70; Order Denying Motion to Reopen Case, *United States v. Lozman*, No. 21-81119 (S.D. Fla. Aug. 12, 2022), ECF No. 64. Since the application was incomplete, the USACOE never issued a permit. Order, *United*

23

*States v. Lozman*, No. 21-81119 (S.D. Fla. June. 20, 2023), ECF No. 67; Order

Granting Motion to Reopen Case, *United States v. Lozman*, No. 21-8119 (S.D. Fla.

July 20, 2023), ECF No. 69.

Moreover, the USACOE has previously denied other permit applications to

fill submerged lands in the Lake Worth Lagoon.  In 2005, the USACOE denied a

permit application to fill two acres of submerged land in the Lake Worth Lagoon,

finding that the fill would result in significant degradation to the surrounding

environment in the Lake Worth Lagoon. DE 134-21.

Finally, Lozman claims that there is no exception under Riviera Beach's

ordinance for an Army Corps-permitted use. That is simply wrong. Since 1991, the

Plan has included a "savings clause" that allows for the development or alteration of

submerged lands if an applicant can demonstrate judicially determined vested rights

to alter the property. DE 134-12 at Pg 36; DE 134-15 at Pg 4; DE 134-14 at Pg 2.

Lozman has never attempted to avail himself of the savings clause.

III.    FLORIDA'S "PUBLIC TRUST DOCTRINE" APPLIES TO
        LOZMAN'S SUBMERGED LAND BECAUSE IT IS A
        "NAVIGABLE WATER" UNDER FLORIDA LAW

As stated by the District Court, it is apparent from the history and evolution

of Florida law pertaining to submerged lands that Lozman never had any right or

reasonable expectation to fill and develop the submerged portion of his land. DE 197

at Pg 18. Lozman claims that his land is not subject to Florida's Public Trust

Doctrine since Lake Worth is not a "navigable water" under Florida law. Br. 25. Lozman is wrong. His submerged land lies beneath "navigable water" under Florida law and its development is barred by Florida's Public Trust Doctrine.

The City does not dispute Lozman's claims that the Public Trust Doctrine applies to lands beneath waters that were navigable at statehood (March 3, 1845). The City also does not dispute that Lake Worth was a freshwater lake in 1845. However, Florida's test for "navigability" is whether the waterbody was navigable-in-fact at Florida's admission into the Union on March 3, 1845. *Odom v. Deltona Corp.*, 341 So.2d 977, 988 (Fla. 1976). To be "navigable-in-fact," a body of water must be "permanent in character, of sufficient size and so situated that it may be used for purposes common or useful to the public in the locality before it will be regarded as navigable." *Baker v. State ex rel. Jones*, 87 So. 2d 497, 498 (Fla. 1956). Florida has long since rejected a "navigability" test based on tidal influence in favor of a test based on the physical characteristics of the waterbody. *Clement v. Watson*, 58 So.25, 26 (Fla. 1912). Thus, state navigable waters include freshwater, non-tidal waterbodies. *Odom*, 341 So.2d at 988; *Broward v. Mabry*, 50 So. 826 (Fla. 1909).

In Florida, meander lines of a waterbody in the official GLO land survey is evidence of navigability which create a rebuttable presumption. *Odom* at 988-89. Although the waterbody's mean high-water line typically denotes the boundary, the meander line represents the boundary line of navigable waters in the absence of

better evidence. *Fla. Bd. of Trustees of Internal Imp. Tr. Fund v. Wakulla Silver Springs Co.*, 362 So. 2d 706, 712–13 (Fla. App. 3rd 1978).

The GLO surveyed the area around Lake Worth in 1858 to create a government plat and section map. The entire Lake Worth shoreline was meandered. DE 134-6 at Pg 2; DE 134-19 at Pgs 11, 62. Moreover, the TIITF Deed conveys lands by reference to the GLO section map. DE 134-6 at Pg 2. According to the TIITF Deed, the eastern boundary of the conveyed lands is the eastern meandered shoreline of Lake Worth established by GLO surveyor Reyes in 1858. *Id.*; DE 134-19 at 10.

Therefore, Lake Worth was a meandered waterbody presumed to have been navigable in 1845. The presumption of navigability is rebuttable, but the property owner has identified no record evidence to the contrary. Although the property owner identifies a "Rand McNally Map" in 1879, its unclear what this map provides. It does not clearly denote the location of Lozman's parcel. Br. 19.

Lozman claims that his property was sold as dry or "overflowed" lands, and that the title to non-navigable swamp and overflowed lands was conveyed to Florida by Congress in the 1850s, separate and apart from Florida's acquisition of title to lands beneath navigable waters in 1845. Br. 28-29. However, sovereign submerged lands were occasionally conveyed as part of swamp and overflowed land deed. *See Odom v. Deltona Corp.*, 341 So.2d 977, 984 (Fla. 1976) Under Florida law, grantees

of TIITF's swamp and overflowed lands are implicitly notified that the acquisition does *not* include sovereign submerged land. *Odom* at 988. This "notice of navigability" applies to large lakes over 140 acres. *Id.* The Lake Worth Lagoon (formerly Lake Worth) is about 21 miles long by 1 to 1 ½ miles wide – it is larger than 140 acres by orders of magnitude. *Singer Island Civic Ass'n*, 2002 WL 1774298 at *13 (Fla. Dep't of Env. Prot. Nov. 16, 2001) (final order).

Lozman also states his deed was issued pursuant to a 1917 Florida law that permitted the sale of submerged land in which the water was not more than three feet deep at high tide. Lozman states this to support the notion that his land was not navigable in 1845. However, Lozman ignores that shallow waters, tide flats and lakes still constitute navigable waters. *See Broward,* 50 So. 826 at 831 ("The shallow body of water in question is navigable even though it goes dry at times and can only be navigated by small boats."); *Martin v. Busch*, 93 Fla. 535, 112 So. 274, 283 (1927)("The navigable waters include lakes, rivers, bays, or harbors, and all waters capable of practical navigation for useful purposes, whether affected by tides or not, and whether the water is navigable or not in all its parts towards the outside lines or elsewhere, or whether the waters are navigable during the entire year or not.").

    IV.    THE DISTRICT COURT CORRECTLY ACKNOWLEDGED THAT THE CITY'S ACTIONS DID NOT STRIP THE PROPERTY OF ITS ECONOMICALLY BENEFICIAL OR PRODUCTIVE USE, EVEN

THOUGH IT MAY NOT BE FILLED AND RESIDENTIALLY
DEVELOPED WITHOUT JUDICIAL ACKNOWLEDGEMENT OF
VESTED RIGHTS AND STATE AND FEDERAL PERMITS,
BECAUSE ITS ECONOMIC VALUE HAS NOT CHANGED AS A
RESULT THE CITY'S ACTION AND BECAUSE THE PROPERTY
STILL HAS PASSIVE USES, INCLUDING MINOR
DEVELOPMENT SUCH AS DOCKS AND VIEWING
PLATFORMS, THE ECONOMIC VALUE OF WHICH HAS BEEN
RECOGNIZED BY THE REAL ESTATE MARKET.

Lozman contends that the City's decades-old restriction still effects a taking of his property because he cannot economically use his property, even though the market value of his property has actually risen. While *Lucas v. South Carolina Coastal Council*, 505 U.S. 1003, 1015 (1992) refers to economically beneficial or productive use, rather than value, there is no statement in *Lucas* suggesting that a restriction to vertical development on a parcel is a complete taking *per se*, where the restriction does not render the property valueless.

In *Lingle v. Chevron U.S.A. Inc.*, 544 U.S. 528, 532 (2005)*,* the Court noted that "the complete deprivation of a property's *value* is the determining factor under *Lucas.*" *Lingle*, 544 U.S. at 539-40. Similarly, in *Good v. U.S.*, 39 Fed. Cl. 81 (Fed. Cir. 1997), the Court considered a *Lucas* claim and held that a defendant could obtain summary judgment by presenting undisputed evidence on the question of whether residual economic value remained in the property post-regulation. *Good v. U.S.,* 39 Fed. Cl. 81, 106 (Fed. Cir. 1997). The *Good* Court determined that an appraisal using

the sales comparison approach was the appropriate manner to answer the question of post-regulatory residual value. *Id.*

Here, the only evidence regarding post-regulation value of the property is the appraisal of Robert Banting.  Mr. Banting compared property sales both before and after Ordinance 4147, for uses consistent with the existing regulatory condition. DE 134-31 at Pg 74. Mr. Banting determined that the property not only retains its value without requiring residential or commercial development, the property's value has actually appreciated the post-regulatory condition as others in the market found uses for the property consistent with the property's permissible uses for environmental mitigation, passive recreation, or the preservation of a view shed for a neighboring property. DE 134-31 at Pg 42.

Lozman dismisses this undisputed evidence by stating that all property retains some residual economic value. However, the *Lucas* court concluded that the property in that case was "valueless," belying Lozman's claim. Similarly, in *Lost Tree Village Corp. v. United States*. *Lost Tree Vill. Corp. v. United States*, 115 Fed. Cl. 219, 228 (2014), *aff'd,* 787 F.3d 1111 (Fed. Cir. 2015), the United Statutes Court of Federal Claims held that a categorical taking requires proof of the literal total loss in *value*. Here, the property is worth several times more than the pre-regulatory condition.  Such an outcome cannot meet the requirements of *Lucas*, even if the act

of filling the submerged property for later subdivision and residential use is restrained.

## CONCLUSION

In spite of his best efforts to characterize his plight as similar to that of the plaintiffs in *Lucas* and *Palazzolo*, Lozman is not in the same situation. Lozman did not attempt to develop his property, only to have the regulatory rug pulled out from under him. Instead, Lozman bought waterfront and submerged land at pennies per acre with full knowledge of the decades-old, regulatory framework restricting its development. Lozman is the litigation speculator discussed by the Court in *Guggenheim.* He has lost no part of the value of his property or his economic investment, but instead seeks a financial windfall through litigation. The District Court correctly concluded that the laws governing facial takings claims under *Lucas* do not justify such an outcome, and the City respectfully requests this Court to affirm the District Court's order.

## CERTIFICATE OF COMPLIANCE

This motion complies with the type-volume limit of Fed. R. App. P. 27(d)(2)(A) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f), this document is limited to thirty pages.

This motion complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this

document has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Times New Roman font.

Respectfully submitted,

LEWIS, LONGMAN & WALKER, P.A.

*/s/ Amy Taylor Petrick*
AMY TAYLOR PETRICK
Florida Bar No. 315590
ANDREW J. BAUMANN
Florida Bar No. 70610
360 South Rosemary Avenue
Suite 1100
West Palm Beach, Florida 33401
Tel: (561) 640-0820
apetrick@llw-law.com
abaumann@llw-law.com
*Attorneys for Appellee*

## CERTIFICATE OF SERVICE

I certify that on November 8, 2023, I electronically filed the foregoing with the Clerk of Court using the CM/ECF, and that the foregoing document is being served this day on all counsel of record via transmission of Notices of Electronic Filing generated by CM/ECF.

*/s/ Amy Taylor Petrick*
AMY TAYLOR PETRICK